ONEIDA INDIAN NATION OF
NEW YORK, Plaintiff,

v.

THE CITY OF SHERRILL, NEW
YORK, Defendant.

The State of New York,
Amicus Curiae,

Madison County, Amicus Curiae,

Oneida County, Amicus Curiae,

Oneida Ltd., Amicus Curiae.

The City of Sherrill, New
York, Plaintiff,

v.

Oneida Indian Nation of New
York, Defendant.

The City of Sherrill, New
York, Plaintiff,

v.

Ray Halbritter; Keller George; Chuck Fougnier; Brian Patterson; Marilyn John; Clint Hill; Dale Rood; Dick Lynch; Ken Phillips; Iva Rodgers; Beulah Green; Ruth Burr, Defendants.

Oneida Indian Nation of New
York, Plaintiff,

v.

Madison County, Defendant.

Nos. 5:00–CV–223 (Lead Case), 5:00–CV–327 (Eviction Case), 5:00–CV–1106 (Member Case), 5:00–CV–506 (Related Case).

United States District Court,
N.D. New York.

June 4, 2001.

Mackenzie Smith Lewis Michell & Hughes, LLP, Peter D. Carmen, of counsel, Syracuse, NY, Zuckerman, Spaeder, Michael R. Smith, William W. Taylor, III, for counsel, Washington, DC, for Plaintiff Oneida Nation and Defendants, Oneida Nation and Halbritter, et al.

Fried, Frank, Harris, Shriver & Jacobson, Ira S. Sacks, of counsel, New York City, for Plaintiff City of Sherrill and Defendant City of Sherrill.

Hon. Eliot Spitzer, Attorney General of the State of New York, David B. Roberts, Asst. Attorney General, of counsel, Albany, NY, for Amicus Curiae, State of New York, Department of Law.

White & Case, LLP, Dwight A. Healy, of counsel, New York City, for Amicus Curiae, State of New York.

Nixon Peabody LLP, David M. Schraver, G. Robert Witmer, Jr., P.C., of counsel, Rochester, NY, for Defendant Madison County and Amicus Curiae Madison County and Oneida County.

Menter, Rudin & Trivelpiece, P.C., James H. McGowan, of counsel, Syracuse, NY, Foley & Lardner, Charles G. Curtis, Jr., of Counsel, Madison, WI, for Amicus Curiae, Oneida Ltd.

HURD, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 231 |
| II. | FACTS | 232 |
| | A. City of Sherrill Properties | 232 |
| | B. Madison County Properties | 233 |
| | C. Historical Background | 233 |
| III. | CLAIMS, COUNTERCLAIMS, AND DEFENSES | 236 |
| | A. Lead Case | 236 |
| | B. Eviction Case | 238 |
| | C. Member Case | 238 |
| | D. Related Case | 239 |
| IV. | DISCUSSION | 240 |
| | A. Summary Judgment Standard | 240 |
| | B. Indian Country | 241 |
| | C. Analysis | 242 |
| | D. Application of Indian Country Finding | 254 |
| | 1. Lead Case | 254 |

 a. Sherrill's Motion for Summary Judgment or Alternative
 Injunctive Relief .......................................... 254
 b. Nation's Cross-motion for Summary Judgment .................... 255
 (1) Taxation Claim ......................................... 255
 (2) Due Process Claim ...................................... 256
 (3) Counterclaims .......................................... 258
 c. Sherrill's Motion to Amend its Answer ........................ 259
 2. Eviction Case ................................................. 260
 3. Member Case .................................................. 260
 a. Failure to State a Claim .................................... 261
 b. Failure to Join an Indispensable Party ...................... 263
 4. Related Case ................................................. 264
 E. Attorneys Fees ................................................ 264

V. CONCLUSION ..................................................... 266

### MEMORANDUM–DECISION and ORDER

*"This litigation makes abundantly clear the necessity for congressional action."*

So said the United States Supreme Court in 1985 in reference to the Oneida Indian Nation land claim. *County of Oneida, New York v. Oneida Indian Nation of New York State*, 470 U.S. 226, 253, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985)(emphasis added)[hereinafter "*Oneida II* "].

Rather than heed the advice of our highest Court, Congress has not enacted legislation to extinguish or resolve Indian title and land claims in New York State. It has turned a deaf ear to the Court and remained silent for over sixteen (16) years.

Further, heroic efforts over many years on the part of Senior District Judge Neal P. McCurn and Settlement Master Ronald J. Riccio to achieve a global settlement of the Oneida Indian Nation claims were met with resistance and ultimate failure. *See Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61, 66 (N.D.N.Y.2000). A political resolution by legislation or agreement has apparently been rejected by Federal, State, and Local governments and by the Oneida Indian Nation. *See id.* at 66.

Instead, the parties have increasingly turned to the courts to settle their disputes. These cases are examples. Unlike the executive and legislative branches of government, the judiciary cannot turn a deaf ear in the face of disputes such as these. Rather, a judge must put aside any personal opinions or ideas and apply the Constitution, Treaties, and laws of this great country. This is the result.

### I. INTRODUCTION

The Oneida Indian Nation of New York ("the Nation" or "the Oneidas") filed a complaint on February 4, 2000, in the lead case, 00–CV–223, pursuant to 28 U.S.C. § 1331, seeking to prevent attempts by the City of Sherrill, New York ("Sherrill") to enforce property tax laws against properties owned by the Nation [hereinafter "Lead Case"]. Sherrill moved for summary judgment, or, in the alternative, for a preliminary injunction. The Nation opposed Sherrill's motion and cross-moved for summary judgment. Additionally, Sherrill has moved for permission to amend its answer to add certain affirmative defenses. The Nation opposes the motion to amend.

On February 22, 2000, the Nation removed to this court, pursuant to 28 U.S.C. § 1441, a petition for eviction filed by Sherrill in New York State Supreme Court, Oneida County, on February 15,

2000 [hereinafter "Eviction Case"]. In the Eviction Case, 00–CV–327, Sherrill sought to evict the Nation from the properties that are the subject of the Nation's February 4, 2000, complaint. Therefore, the Eviction Case was consolidated with the Lead Case on June 14, 2000.

Sherrill filed a complaint on July 17, 2000, pursuant to 28 U.S.C. § 1362, seeking declaratory relief and damages from individually named representatives of the Nation's Men's Council and Clan Mothers relating to the taxation of the properties at issue in the two aforementioned actions [hereinafter "Member Case"]. An amended complaint was filed as of right on August 7, 2000. The Member Case, 00–CV–1106, was thereafter consolidated with the Lead and Eviction Cases. The individually named Nation representatives, Ray Halbritter, Keller George, Chuck Fougnier, Brian Patterson, Marilyn John, Clint Hill, Dale Rood, Dick Lynch, Ken Phillips, Iva Rodgers, Beulah Green, and Ruth Burr (collectively "Nation representatives") moved to stay this action and to dismiss. Sherrill opposed the motion.

On November 13, 2000, Madison County and Oneida County ("the Counties"), New York State, and Oneida Ltd. filed, with permission, briefs as amici curiae in support of Sherrill's motion for summary judgment or alternatively for injunctive relief and in opposition to the Nation's motion for summary judgment. The Nation did not object to the filing of the amici curiae briefs, but did submit a responsive brief.

Also currently pending is a related case, 00–CV–506, filed by the Nation pursuant to 28 U.S.C. § 1331, against Madison County seeking to prevent enforcement of the County's property tax laws [hereinafter "Related Case"]. A motion to dismiss is pending in that action.

Oral argument was heard regarding all motions on March 9, 2001, in Utica, New York. Decision was reserved.

## II. FACTS

### A. City of Sherrill Properties

In 1997 and 1998 the Nation purchased, in open market transactions, fee simple title to certain parcels of land within the municipality of Sherrill. These parcels are designated by Sherrill as 322.014–1–23, 322.014–1–24, 322.014–1–25, 322.014–1–26, 322.015–2–1, 322.015–2–64, 322.015–2–65, 322.015–2–40.3, 322.015–2–45.1, 322.015–2–47. The Nation operates a gasoline filling station with convenience store and a textile manufacturing and distribution facility on the properties. Sherrill assessed property taxes against these parcels. The Nation did not pay the assessed taxes, asserting that the properties are contained within the Oneida Indian Reservation ("the Reservation") and therefore are nontaxable by state municipalities.

The Nation has a Silver Covenant Chain Grant program under which it makes *ad valorem* grants to schools and municipalities in which repossessed aboriginal lands are located. In order to participate in this program the municipality must remove such lands from its tax rolls pending resolution of the Nation's land claims. Sherrill and Madison County have not participated in the Nation's Silver Covenant Chain Grant program.

On August 7, 1997, Sherrill sent the Nation notices of tax delinquency. (Carmen Aff. sworn Sept. 11, 2000, Ex. 17 [hereinafter "First Carmen Aff."].) One notice set forth a total delinquency of $2,239.23, including overdue tax, penalties, and interest. A second and third notice each set forth a total delinquency of $22.59, including overdue tax, penalties, and interest. Thus, the total delinquency at that time was $2,284.71. None of the

three notices identified a parcel or parcels. The notices each warned, "If you do not wish to have your name and property advertised for tax sale, payment of the unpaid taxes must be received by September 2, 1997." *Id.* In keeping with its assertion that the properties were nontaxable Reservation land, the Nation did not respond to the notices.

In September and October 1997 Sherrill advertised, in a local newspaper, that three Nation parcels would be sold for 1997 unpaid taxes on November 5, 1997. These parcels were identified as 322.014–1–26, 322.014–1–23, and 322.014–1–25. Sherrill did not serve the Nation with notice of the tax sale. The tax sale was held on that date and Sherrill purchased the properties. Pursuant to the Sherrill City Charter, a property owner may redeem a property sold at tax sale within two years of the sale. In November 1999 Sherrill published a notice in a local newspaper that the redemption period for the three parcels would expire on February 8, 2000. On January 10, 2000, Sherrill personally served notice on the Nation that the expiration period to redeem the properties was February 8, 2000. On February 9, 2000, Sherrill recorded deeds for the properties. On February 17, 2000, Sherrill initiated eviction proceedings in New York State Supreme Court, Oneida County.

Meanwhile, Sherrill assessed property taxes and initiated enforcement proceedings against several other Nation properties. Sherrill purchased four parcels, 322.015–2–1, 322.014–1–24, 322.015–2–65, and 322–015–2–64, at a tax sale on November 5, 1998. On March 6, 2000, Sherrill notified the Nation of the impending expiration of the redemption period of November 5, 2000, for these four parcels.

On November 10, 1999, Sherrill purchased an additional three parcels, 322–015–2–40.3, 322–015–2–45.1, 322–015–2–47 at tax sale. On March 6, 2000, Sherrill notified the Nation that the redemption period for these three parcels would expire on November 10, 2001.

Sherrill alleges a total tax liability for all of these parcels of approximately $15,000. The above-captioned actions followed.

### B. *Madison County Properties*

In the 1990s the Nation acquired thirteen parcels of land located within Madison County. These parcels are identified as 28.–2–13.11, 28.–2–13.2, 36.5–1–20, 36.38–1–34, 36.6–1–4, 36.38–1–33, 36.38–1–32, 36.62–2–21, 91.–1–51, 36.6–1–1, 36.6–1–3, 36.–1–2, and 28.–2–13.12. The county assessed property taxes against these parcels. The Nation again asserted that these properties were within the Reservation and therefore were nontaxable. On December 1, 1999, the county initiated an *in rem* foreclosure action, for nonpayment of taxes, against these parcels in New York State Supreme Court, Madison County. The Nation alleges that Madison County never provided it with notice or a redemption period, as required by New York State law.

### C. *Historical Background*

A brief discussion of the historical background of the Nation and its lands, as well as the federal policy toward the Indians lends perspective to the claims and the arguments. From before the Revolutionary War colonists' interaction with the Indians was in the spirit of cooperation and good faith. The Indians' right to the possession of their aboriginal lands was assumed, and termination of such title was restricted. *Oneida II*, 470 U.S. at 234, 105 S.Ct. at 1251. The Oneidas[1] claimed ab-

---

1. The Oneidas were one of the Six Nations of the Iroquois, "the most powerful Indian Tribe

original lands of six million acres in Central New York, from Lake Ontario to the Adirondack foothills and from Pennsylvania north to the St. Lawrence River. *Id.* at 230, 105 S.Ct. at 1249. In 1784, shortly after the Revolutionary War ended, the first treaty between the United States and the Indians was executed, at Fort Stanwix, New York (present day Rome, New York). The United States, in recognition for the Oneidas' support during the war, guaranteed the Oneidas security " 'in the possession of the lands on which they are settled.' " *Id.* at 231, 105 S.Ct. at 1249–50 (quoting the Treaty of Fort Stanwix, 7 Stat. 15 (Oct. 22, 1784)).

In 1790 Congress passed, in keeping with the policy of protecting the Indians and their lands, the first Indian Trade and Intercourse Act, ch. 33, 1 Stat. 137. *Id.* Commonly referred to as the Nonintercourse Act, now codified at 25 U.S.C. § 177, this legislation prohibited conveyance of Indian lands except by treaty with the federal government. *Id.* at 231, 105 S.Ct. at 1251. Later amendments continue the prohibition on alienation of Indian land without congressional action. *See* 25 U.S.C. § 177.

In 1788 New York State purchased most of the Nation's remaining land, reserving 300,000 acres to the Nation. *Oneida II,* 470 U.S. at 231, 105 S.Ct. at 1250. Other treaties, such as the Treaty of Harmar, 7 Stat. 33 (Jan. 9, 1789), and the Treaty of Canandaigua, 7 Stat. 44 (Nov. 11, 1794), reaffirmed the federal government's promise of security to the Oneidas in the possession of their lands. *Oneida II,* 470 U.S. at 231, 105 S.Ct. at 1250. The Sherrill parcels are among the lands reserved to the Nation in 1788 and confirmed as reservation land in the Treaty of Canandaigua.[2] (Thomas Decl. ¶ 10.) In 1795 New York State purchased the majority of the Oneidas' remaining 300,000 acres. *Oneida II,* 470 U.S. at 231, 105 S.Ct. at 1250. Thereafter, fee title to the land has passed in free market transactions.[3]

Beginning in the early 1800's the federal policy toward the Indians shifted toward removing Indians from the east into the western territories. Felix S. Cohen, *Handbook on Federal Indian Law* 78–79 (1982 ed.)[hereinafter "Cohen"]. Treaties during this period provided for the relinquishment of Indian land in the east and set apart reservation land for the Indians in the west. *See generally id.* at 78–92. Movement of the eastern tribes to the west freed the eastern land for white settlements.

Between 1820 and 1822 some Oneidas and other New York Indians relocated to land purchased on their behalf from the Menominee and Winnebago nations in Wisconsin.[4] *New York Indians,* 170 U.S.

in the Northeast at the time of the American Revolution." *Id.* at 230, 105 S.Ct. at 1249. The Six Nations consisted of the Mohawk, Oneida, Onondaga, Cayuga, Seneca, and Tuscarora nations.

2. Sherrill contends that issues of fact remain as to whether the Sherrill parcels are within the reservation confirmed by the Treaty of Canandaigua. (Sacks Aff. Jan. 30, 2001, ¶ 4.) However, Sherrill has adduced no competent evidence to raise such a question of fact.

3. The United States Supreme Court has determined that the Oneidas have a federal com- mon law right of action for violation of their possessory rights to these lands, due to the undisputed lower court finding that the 1795 purchase violated the Nonintercourse Act. *Id.* at 233, 236, 105 S.Ct. at 1250, 1252.

4. Also relocating to the 500,000–acre Wisconsin reservation during this period were some members of other tribes of the Six Nations, as well as the St. Regis, Stockbridge, and Munsee tribes. *New York Indians v. United States,* 170 U.S. 1, 12–13, 18 S.Ct. 531, 533, 42 L.Ed. 927 (1898).

at 12–14, 18 S.Ct. at 533. Some disagreement about the land ensued, and approximately 500,000 acres in Wisconsin were reserved for the use of the Oneidas and other New York Indians. *Id.* at 14, 18 S.Ct. at 533. Other Oneidas relocated to Ontario, Canada. *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 536 (N.D.N.Y.1977)(Port, J.), *aff'd,* 719 F.2d 525 (2d Cir.1983), *aff'd in part & rev'd in part,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). The Oneida Nation thus splintered into three distinct bands, the New York Oneidas, the Wisconsin Oneidas, and the Thames Oneidas. *See id.*

In 1830 Congress passed the Indian Removal Act, ch. 148, 4 Stat. 411, authorizing the exchange of eastern land for land west of the Mississippi River. Cohen at 81. Among the removal treaties into which the Indians and the federal government entered was the Treaty of Buffalo Creek, 7 Stat. 550 (Jan. 15, 1838). *New York Indians,* 170 U.S. at 1, 18 S.Ct. at 531. Pursuant to the Treaty of Buffalo Creek the New York Indians, including Oneidas, ceded Wisconsin reservation lands in exchange for reservation lands west of the Mississippi River in what is now Kansas. *Id.* at 15, 18 S.Ct. at 533. The Treaty of Buffalo Creek further provided that New York Oneidas "hereby agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida." 7 Stat. § 550 Art. 13. However, the Indians did not remove to Kansas. *New York Indians,* 170 U.S. at 9–10, 18 S.Ct. at 532–33. Moreover, there is no evidence that "satisfactory arrangements with the Governor of the State of New York" were ever made for the purchase of the Oneidas' New York lands.

Toward the latter 1800's the federal policy shifted toward assimilating the Indians into the white culture. *Solem v. Bartlett,* 465 U.S. 463, 466, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984). This assimilation policy was carried out through allotment. *See id.* at 467, 104 S.Ct. at 1164; *see generally* Cohen at 128–132. The Dawes Act, ch. 119, 24 Stat. 388, and subsequent surplus land acts,[5] furthered this policy. *See* Cohen at 130–32. The surplus land acts provided for the allotment of set amounts of acreage to individual Indians, with the land held in severalty. *Id.* at 130–31. The allotments made to individual Indians were inalienable for twenty-five years, in keeping with the federal policy of protecting the Indians and their lands, after which it was thought that the Indians would assimilate into the culture of the white settlers who by then would surround the allotted land. Small amounts of land were reserved for tribal ownership to be used for common purposes, such as education. Unallotted, or surplus, lands were then opened for homesteading by white settlers. More than 90 million acres of tribal land were opened for settlement in this manner.

Allotment resulted in a checkerboard pattern of Indian and non-Indian ownership of reservation lands. Depending upon Congressional intent in opening the lands, some surplus lands have been found to continue to constitute reservation land, *see, e.g., Solem,* 465 U.S. at 481, 104 S.Ct. at 1171, and in some cases not, *see, e.g., South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 338, 118 S.Ct. 789, 805, 139 L.Ed.2d 773 (1998).

By the early twentieth century the federal policy again shifted, recognizing that

---

5. In 1871 Congressional action ended treaty-making with the Indians. Cohen at 107 & n. 371. Thereafter, congressional action, in statutory form, was required for each cession or other conveyance of Indian land.

assimilation was not occurring and preservation of the Indian culture was not only acceptable but desirable. Cohen at 144. In 1934 the Indian Reorganization Act ended allotment, encouraged tribal self-government, made funds available for economic improvement of the Indians, and made further provisions for protecting Indian lands. *See id.* at 147–49. However, as World War II came to an end resistance to reorganization developed and a policy aimed at terminating federal control and supervision of the Indian tribes evolved. *Id.* at 152–59. Once terminated, a tribe lost its sovereignty and became subject to state jurisdiction. *Id.* at 174–75.

The termination policy was repudiated in 1958, and an era of Indian self-determination began. *Id.* at 180. This policy shift reflected the overall rise in concern for the civil rights of all ethnic minorities. *Id.* at 180–81. Beginning in 1973 Congress restored the sovereignty of several of the tribes previously terminated. *Id.* at 186–87. Programs were funded to improve Indian housing, education, economic development, health, and culture. *Id.* at 189–96. Moreover, a policy toward the development of reservations and return of aboriginal lands to the Indians arose. *Id.* at 196–200.

From the late 1700s until the middle 1960s the Oneidas attempted, in vain, to obtain redress for land claims and other grievances. *Oneida Indian Nation of New York State v. County of Oneida,* 719 F.2d 525, 529 (2d Cir.1983)(noting that the Oneidas perceived their treatment by the

State during this period as "improper, deceitful, and overreaching"). In 1970 the Nation brought a lawsuit seeking damages for the "illegal use and occupancy of a part of their aboriginal land" during 1968 and 1969. *Id.* at 532. The suit was originally dismissed at the trial court level for lack of jurisdiction. *Id.* at 530. On appeal, the United States Supreme Court found that federal question jurisdiction existed. *Oneida Indian Nation v. County of Oneida, New York,* 414 U.S. 661, 678, 94 S.Ct. 772, 782–83, 39 L.Ed.2d 73 (1974). After a finding of liability and the assessment of damages in the trial court,[6] the United States Supreme Court affirmed the Oneidas' federal common law right of action for unlawful possession of their lands. *Oneida II,* 470 U.S. at 233, 105 S.Ct. at 1251.

In 1974 the New York and Wisconsin Oneidas filed an additional land claim action. *See Oneida Indian Nation,* 199 F.R.D. at 66. At issue in that action is approximately 250,000 to 300,000 acres that the Oneidas claim was illegally alienated by some thirty agreements. *Id.* at 66 & n. 3.

In the 1990s the Nation began reacquisition of lands within the Reservation. These reacquisitions have taken place in free market transactions, and the Nation received fee simple title to the properties.

### III. CLAIMS, COUNTERCLAIMS, AND DEFENSES

#### A. Lead Case

In the Lead Case the Nation sues Sherrill to terminate its efforts to enforce its *ad*

---

**6.** The trial court assessed damages in the amount of "$9,060 plus interest against Madison County and $7,634 plus interest against Oneida County for their unlawful use and occupation of the Oneidas' land for the years 1968 and 1969." *Oneida Indian Nation of New York State,* 719 F.2d at 540. The Second Circuit affirmed the finding of liability but remanded for recomputation of damages. *Id.*

at 544. The United States Supreme Court granted the petition for certiorari brought by Madison and Oneida Counties and New York State, *see* 465 U.S. 1099, 104 S.Ct. 1590 (1984), to answer the question of whether the Oneidas "may bring a suit for damages for the occupation and use of tribal land allegedly conveyed unlawfully in 1795." 470 U.S. at 229, 105 S.Ct. at 1248–49.

*valorem* property tax laws with respect to land owned by the Nation located within Sherrill. The Nation avers that the properties at issue are within and are a part of the Reservation recognized by the 1794 Treaty of Canandaigua. The Nation further avers that the properties have always been a part of the Reservation, although the Nation was not in possession, and the federal government has never changed the Reservation status nor made properties within the Reservation subject to state or local taxation. The Nation claims that in 1805 New York State caused the properties to be conveyed to one Cornelius Dockstader, a Nation member. In 1807 New York purported to give permission for Dockstader to sell the land, and Dockstader *did* sell the land to a non-Indian. Thereafter the properties have been in the possession of non-Indians until the reacquisition of the properties in 1997–98. The Nation claims that these conveyances were in violation of the Nonintercourse Act, 25 U.S.C. § 177, and therefore are void *ab initio*.

The Nation first claims that the properties constitute Reservation land and therefore are Indian Country within the meaning of 18 U.S.C. § 1151. According to the Nation, under Article I, Section 8 of the United States Constitution authority over this property is exclusive to the federal government, precluding the state and its political subdivisions from imposing their taxes. Imposition of such taxes by the states and its political subdivisions also violates the Nation's tribal sovereign immunity. The Nation seeks redress from the aforesaid violations of the rights guaranteed by the Constitution and laws of the United States pursuant to 42 U.S.C. § 1983.

For its second claim the Nation avers that the process by which Sherrill purported to deprive the Nation of its properties and evict it from the properties failed to provide due notice. The Nation therefore seeks redress under 42 U.S.C. § 1983 for this alleged violation of its due process rights as secured by the Constitution and laws of the United States and the laws of New York.

The Nation seeks a declaration that Sherrill may not impose or attempt to collect property taxes based upon lands owned and possessed by the Nation within Sherrill, that the Nation and its lands are not subject to taxation by Sherrill, that Sherrill's purported conveyances of the properties for delinquency of taxes are null and void, and that Sherrill may not evict the Nation from its lands and any attempt to do so are null and void. The Nation further seeks an injunction prohibiting Sherrill and any other person in active concert or participation with Sherrill from subjecting the Nation and its lands to property taxation, prohibiting it from interfering with the Nation's ownership and possession of its lands and from any effort to evict the Nation from such lands, and mandating that they void and rescind all notices, liens, sales, auctions, conveyances and other official documents or acts taken with respect to enforcement of the property tax laws as against the Nation and its lands. Finally, the Nation seeks attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Sherrill answered, denying the material allegations of the complaint. Sherrill also brings counterclaims. Sherrill avers that despite wrongful nonpayment of taxes, and in some cases foreclosure, the Nation remains in possession of the properties. Sherrill claims that the Nation has been and is being unjustly enriched by receipt of valuable municipal benefits including police and fire protection, garbage removal, road maintenance, and zoning enforcement and planning. First Sherrill seeks a decla-

ration that it may properly assess property taxes against these properties and any other properties that may come into the Nation's possession in the future. Second, Sherrill seeks a judgment evicting the Nation from the foreclosed property. Third, Sherrill seeks damages for the unjust enrichment of the Nation for services provided by the municipality. Fourth, Sherrill requests a preliminary and permanent injunction prohibiting the Nation from purchasing additional properties, any part of which are located within Sherrill's boundaries. Finally, Sherrill seeks an order enjoining the Nation from building and/or expanding upon the existing building structure, or erecting new structures, on the foreclosed properties.

The Nation denies the material allegations of the counterclaims, including Sherrill's right to tax the properties. The Nation also asserts the affirmative defenses of failure to state a claim; sovereign immunity; violation of federal law; federal law preemption; the Supremacy Clause of the United States Constitution; due process violation; violation of the Nonintercourse Act; violation of the Equal Protection Clause of the United States Constitution; violation of the Due Process Clause of the United States Constitution; violation of the Takings Clause of the United States Constitution; violation of the Privileges and Immunities Clauses of the United States Constitution; prohibition of the relief requested by the Indian Commerce Clause, the Fifth Amendment, and the Fourteenth Amendment; failure of the Congress to authorize taxation or alienation of the lands in dispute; entitlement to set-off for funds paid to Oneida County pursuant to the Silver Covenant Chain Grant program; nonjusticiability; and estoppel due to Sherrill's refusal to accept the Silver Covenant Chain Grant payments.

### B. *Eviction Case*

Sherrill petitioned New York State Supreme Court, Oneida County, to order an eviction of the Nation from the properties designated as 322.014–1–23, 322.014–1–25, and 322.014–1–26. The petition asserts that Sherrill acquired the title to these properties through foreclosure and sale for nonpayment of taxes. The Nation removed the action to this court asserting that federal law completely preempts Sherrill's claim that it has title to and the right to possess this land and the eviction action is a compulsory counterclaim to the Lead Case. In answer the Nation denies that Sherrill has the right to assess taxes against the properties or that it holds valid title to the properties. The Nation asserts the affirmative defenses of failure to state a claim; sovereign immunity; federal law protection of reservation land; federal preemption of state and local law; the Supremacy Clause of the United States Constitution; insufficient process and service of process; violation of due process as set forth in the Lead Case; and the petition is duplicative of a compulsory counterclaim in the Lead Case.

### C. *Member Case*

Sherrill avers that the Nation representatives dominate and control the Nation and its activities. Sherrill claims that the Nation representatives caused the Nation to refuse to pay the property taxes it assessed against the properties and to fail to collect state sales tax on goods sold on the properties, including goods sold to non-Indians. Sherrill further avers that the Nation's refusal to pay property taxes and collect sales taxes, at the direction of the Nation representatives, causes tax-paying citizens to suffer in the quality and availability of municipal services. Sherrill asserts that because the Nation may plead sovereign immunity as a bar to any lawsuit

to collect taxes owed, the responsible Nation representatives may be sued. As a first cause of action Sherrill seeks a declaratory judgment that it may lawfully impose and attempt to collect property taxes from the Nation representatives on the properties currently owned by the Nation and on any properties acquired by the Nation in the future, and that its Charter applies to such properties. Sherrill further seeks a declaration that the Nation representatives are in violation of New York State law because the Nation refuses to collect state sales tax on the properties. Sherrill's second cause of action is for an order evicting the Nation representatives and all other Oneidas from the foreclosed property. Third, Sherrill seeks damages for what it alleges to be unjust enrichment of the Nation by provision of municipal services. Fourth, Sherrill requests a preliminary and permanent injunction prohibiting the Nation representatives from purchasing additional properties, any part of which are located within the boundaries of Sherrill, without first agreeing to pay property tax and agreeing to collect state sales tax on any additional properties. Sherrill's fifth cause of action is for a preliminary and permanent injunction prohibiting the Nation representatives from expanding and/or building upon the existing structure and/or erecting new structures on Nation-owned properties within Sherrill boundaries.

In lieu of an answer the Nation representatives move for a stay pending a decision on summary judgment in the Lead Case, which may moot this action, or to dismiss. The motion to dismiss is based upon failure to state a claim because the Nation representatives are not the owners of the properties; Sherrill lacks authority to enforce property taxes due to federal law; Sherrill lacks authority to enforce the state sales tax law and the property tax as set forth in the Sherrill City Charter under the property and sales tax laws of New York State; Sherrill has failed to name indispensable parties the Nation, New York State, and all other owners of land in Sherrill; and tribal sovereign immunity.

### D. *Related Case*

The Nation brings this action to prevent Madison County from pursuing further efforts to enforce its *ad valorem* property tax laws with respect to Nation lands located within the County. The Nation avers that the properties at issue are located within and are part of the Reservation recognized in the 1794 Treaty of Canandaigua. The Nation further avers that the federal government has never modified the reservation status of these properties nor made them subject to taxation by a state or local government. One of the properties at issue was alienated by a 1795 Treaty between the Oneidas and New York State. The other properties were transferred by a Treaty with New York State in 1807. Since 1795 and 1807, respectively, the properties were out of the Nation's possession until their reacquisition in the 1990s. The Nation avers that neither transaction met the requirements of the Nonintercourse Act, and therefore were void *ab initio*.

The Nation's first claim is that federal law, including the 1794 Treaty of Canandaigua; Article I, Section 8 of the United States Constitution; the Nonintercourse Act; and federal common law, preempt any right of Madison County to impose taxes upon the properties and attempts by the county to collect such taxes violates federal law. This claim also avers that the county's attempts to collect such taxes violate the Nation's sovereign immunity, as well as the rights, privileges, and immunities secured to the Nation by the United States Constitution and laws. Secondly, the Nation avers that the county failed to

give it the process it was due with regard to taxation and foreclosure upon Nation lands. The Nation therefore seeks a declaration that the county may not impose or seek to collect *ad valorem* property taxes from the Nation based upon the lands it owns and possesses; the Nation and its lands are not subject to such taxation; any purported taxation or foreclosure for tax delinquency is null and void; and the state court is without jurisdiction or power with respect to taxation of Nation lands. It also seeks an injunction prohibiting Madison County from subjecting the Nation and its lands to *ad valorem* property taxation; prohibiting the county from any interference with ownership and possession of its lands and from efforts to foreclose on the Nation's lands or to litigate in state court concerning taxation of its lands; and mandating that the county void and rescind all notices, liens, petitions, and other official documents or acts taken with respect to enforcement of such taxes as against the Nation and its lands. Finally, the Nation seeks attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Madison County filed its motion to dismiss in lieu of an answer. The county asserts that the Wisconsin and Thames Oneidas are indispensable parties, and as they cannot be joined, the action should be dismissed pursuant to Fed.R.Civ.P. 19. The Nation opposes. This motion is addressed in a separate Memorandum–Decision and Order filed this day.

## IV. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56;

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991); *Cayuga Indian Nation of New York v. Cuomo*, 667 F.Supp. 938, 940 (N.D.N.Y.1987). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

Disputes as to irrelevant or unnecessary facts are immaterial. *Cayuga Indian Nation*, 667 F.Supp. at 940 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510). " 'Any proof or evidentiary requirements imposed by the substantive law are not germane to [the materiality] inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.' " *Id.* (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510).

When the moving party has met its the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356. At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356. To with-

stand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510; *see Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356 (stating that there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). Merely colorable or not significantly probative evidence is insufficient to withstand summary judgment. *Cayuga Indian Nation,* 667 F.Supp. at 940–41 (quoting *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2511).

## B. *Indian Country*

The parties agree that the basic question for resolution in this case is whether the properties in issue are Indian Country. If the properties are Indian Country, the state and its municipalities lack jurisdiction to impose property taxes,[7] absent explicit congressional direction. *Okla. Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458, 115 S.Ct. 2214, 2220, 132 L.Ed.2d 400 (1995) (citation omitted); *Okla. Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 128, 113 S.Ct. 1985, 1993, 124 L.Ed.2d 30 (1993); *see McClanahan v. State Tax Comm'n,* 411 U.S. 164, 169, 93 S.Ct. 1257, 1260–61, 36 L.Ed.2d 129 (1973)(citing *The Kansas Indians,* 72 U.S.(5 Wall.)737, 18 L.Ed. 667 (1866)).

■■■ The statutory definition of Indian Country, although found in the criminal code at 18 U.S.C. § 1151, "'applies to questions of both criminal and civil jurisdiction.'" *Narragansett Indian Tribe v. Narragansett Elec. Co.,* 89 F.3d 908, 915 (1st Cir.1996)(quoting *California v. Cabazon Band of Mission Indians,* 480 U.S.

202, 208, 107 S.Ct. 1083, 1088, 94 L.Ed.2d 244 (1987)). Classification of certain lands as Indian Country "is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian land." *Id.* (internal quotations omitted). The determination of whether certain land constitutes Indian Country is a matter for the court rather than the jury. *United States v. Roberts,* 185 F.3d 1125, 1140 (10th Cir.1999)(citing *United States v. Cook,* 922 F.2d 1026, 1031–32 (2d Cir.1991)).

■■■ Indian Country includes "'formal and informal reservations, dependent Indian communities, and Indian allotments.'" *Chickasaw Nation,* 515 U.S. at 453 n. 2, 115 S.Ct. at 2217 n. 2 (quoting *Sac & Fox Nation,* 508 U.S. at 126, 113 S.Ct. at 1991); *Thompson v. County of Franklin,* 15 F.3d 245, 250 (2d Cir.1994). Section 1151 provides, with exceptions not relevant here, that Indian Country means:

(a) land within the limits of an Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which haven not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Thus, a formal reservation falls within the definition of Indian Country. *Cabazon Band of Mission Indians,* 480 U.S. at 207 n. 5, 107 S.Ct. at 1087 n. 5. However, formal reservation status is

---

**7.** No argument is made that should a finding be made that the properties in question are

Indian Country, they are nonetheless taxable.

not a prerequisite to qualification as Indian Country. *HRI, Inc. v. Envtl. Prot. Agency,* 198 F.3d 1224, 1249 (10th Cir.2000). Rather, determinative is whether there has been a valid set aside of the land by the federal government for the Indians' use and federal supervision of the land. *Id.* at 1249–50; *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991).

■ Reservation status of Indian land may be changed only upon a plain and unambiguous expression of congressional intent to do so. *Cayuga Indian Nation,* 667 F.Supp. at 944 (citing *Oneida II,* 470 U.S. at 247–48, 105 S.Ct. at 1258); *Narragansett Indian Tribe,* 89 F.3d at 914. Congressional intent to terminate Indian title to land will not be " 'lightly implied' " because of the "strong policy of the United States 'from the beginning to respect the Indian right of occupancy.' " *Oneida II,* 470 U.S. at 248, 105 S.Ct. at 1258 (quoting *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 345–46, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941)).

■ Because Congressional action is required to alienate Indian land, 25 U.S.C. § 177, either a treaty approved by Congress [8] or a statute must plainly and unambiguously express the intent to effect such an alienation, *see Oneida II,* 470 U.S. at 247–48, 105 S.Ct. at 1258. Canons of construction "rooted in the unique trust relationship between the United States and the Indians" apply in interpreting treaties and statutes involving Indians. *Id.* at 247, 105 S.Ct. at 1258. Treaties must be given a liberal construction in favor of the Indians. *Id.* Ambiguous provisions must be interpreted to the benefit of the Indians.

*Id.* An abrogation of Indian treaty rights will not be found absent explicit language. *Id.*

■ In keeping with the strong policy of the federal government to protect Indian lands, once an Indian tribe makes out a prima facie case of prior possession or title to the property in dispute, the burden of proof rests upon the non-Indian to demonstrate otherwise. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 668–69, 99 S.Ct. 2529, 2538–39, 61 L.Ed.2d 153 (1979)(citing 25 U.S.C. § 194). The burden of proof thus shouldered by the non-Indian questioning Indian title encompasses both the burden of producing evidence and the burden of persuasion. *Id.*

## C. *Analysis*

As the motion and cross-motion for summary judgment turn on a determination of the Indian Country status of the properties, a separate analysis of each will not be undertaken. Rather, the Indian Country status will be analyzed, then the implications of that determination upon each motion will be evaluated.

■ Sherrill argues that the properties in issue are not Indian Country because they (1) were purchased in private transactions; (2) were not purchased from the federal government; (3) have not been set aside by the federal government for Indian use; (4) are not superintended by the federal government; and (5) receive services not from the federal government, but rather from Sherrill. Oneida Ltd., the Counties, and New York State, as amici curiae, argue that the Reservation was disestablished or diminished by the 1838 Treaty of

---

8. Beginning in 1871 Indian tribes were no longer dealt with by treaty, but solely by legislative act. *Stephens v. Cherokee Nation,* 174 U.S. 445, 483, 19 S.Ct. 722, 736, 43 L.Ed. 1041 (1899)(quoting 16 Stat. 544 § 2079). The legislation that ended Indian treaty-making provided that prior treaties remained valid. *Id.*

Buffalo Creek and therefore the properties are not Indian Country.

The Nation argues that the properties are within its aboriginal lands and within the Reservation guaranteed by the 1794 Treaty of Canandaigua. The Nation further argues that the Reservation was not disestablished or diminished and therefore the properties in issue are Indian Country. The Nation does not contend that the properties constitute a dependent Indian community pursuant to 18 U.S.C. § 1151(b), or Indian allotment pursuant to 18 U.S.C. § 1151(c).

The arguments of the parties thus turn on a determination of the reservation status of the properties, pursuant to 18 U.S.C. § 1151(a). This determination will answer the Indian Country and taxability inquiries, as previously noted.

The Oneidas' aboriginal lands encompassed six million acres of Central New York. *See Oneida II*, 470 U.S. at 230, 105 S.Ct. at 1249. The properties at issue are within the Oneidas' aboriginal lands. *Id.* (describing the extent of the Oneida land from the Pennsylvania border to the St. Lawrence River and from Lake Ontario to the Adirondack foothills). The Nation fur-

ther relies upon the 1794 Treaty of Canandaigua and its expert's conclusion that the properties are within the Reservation confirmed by that Treaty.

The Treaties of Fort Stanwix and Fort Harmar designated the Reservation land. (First Carmen Aff. Ex. 3–4.) The 1788 Treaty of Fort Schuyler again designated the land reserved to the Oneidas. *Id.* Ex. 5. The Treaty of Canandaigua confirmed and guaranteed the Nation's right to occupy those Reservation lands. *Id.* Ex. 6. The properties are within the Reservation lands. (Thomas Decl. ¶ 10.) The properties were conveyed to one Cornelius Dockstader, an Oneida, in 1805. *Id.* at ¶ 11(b); First Carmen Aff. Ex. 8. Dockstader conveyed the lands to one Peter Smith in 1807. (Thomas Decl. Ex. 11(c); First Carmen Aff. Ex. 10.) Thereafter, the lands were conveyed to others until 1997 and 1998. (Thomas Decl. Ex. 11(d).)

Sherrill contends that these facts are in dispute. (*See* Sherrill Resp. L.R. 7.1 Statement.) [9] However, Sherrill has not set forth competent evidence that raises a dispute as to these facts. For example, the Nation set forth the following as an undisputed fact: "The Nation's lands in Sherrill

---

9. Local Rule 7.1(a)(3) provides

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the mov-

ant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

Thus, in order to withstand a motion for summary judgment a party must specifically cite to the record for the evidence that raises a factual issue. L.R. 7.1(a)(3). Merely stating that a fact is in dispute, without citing to record evidence that raises a dispute, is insufficient. *See id.*

were part of the lands possessed by the Nation for centuries before this country was formed, often referred to as 'aboriginal' lands. Carmen Aff. at ¶ 6." (Nation L.R. 7.1 Statement.) Sherrill responded as follows: "Sherrill does not have sufficient information to admit or dispute paragraph 3." (Sherrill Resp. L.R. 7.1 Statement ¶ 3.) The Nation also set forth the following as an undisputed fact: "The Nation's lands in Sherrill were part of the Oneida reservation guaranteed and confirmed in the 1794 Treaty of Canandaigua. Carmen Aff. at ¶¶ 9–10, exh.6; Declaration of Paul A. Thomas, Jr., at ¶ 10." (Nation L.R. 7.1 Statement.) In response, Sherrill again stated: "Sherrill does not have sufficient information to admit or dispute paragraph 4." (Sherrill Resp. L.R. 7.1 Statement ¶ 4.) The Nation stated: "The reservation lands that the Nation now possesses in Sherrill were out of the Nation's possession from 1805 to 1997–1998. Carmen Aff. at ¶¶ 14–15, exhs. 8–10." (Nation L.R. 7.1 Statement ¶ 9.) Sherrill responded: "Sherrill disputes paragraph 9. [The Nation] has no reservation land in Sherrill. *See* Sherrill Mem. at 14–16. Sherrill does not have sufficient information to admit or dispute the remaining content of paragraph 9." (Sherrill Resp. L.R. 7.1 Statement ¶ 9.)

As these responses demonstrate, Sherrill has not raised even a metaphysical doubt as to these material facts set forth by the Nation as undisputed. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356. Moreover, Sherrill has not set forth any additional facts as to which it contends a dispute exists. (*See* Sherrill Resp. L.R. 7.1 Statement.) Against the backdrop of these undisputed facts, the Indian Country analysis will be carried out.

The undisputed facts establish that the properties are within the Oneidas' aboriginal lands and within the Reservation confirmed by the 1794 Treaty of Canandaigua. The Nation has thus made a prima facie showing of prior possession and title to the properties. *See Omaha Indian Tribe*, 442 U.S. at 668–69, 99 S.Ct. at 2538 (finding that a showing that land was once occupied by the tribe as a reservation sufficient to constitute prima facie showing to raise 25 U.S.C. § 194 presumption). Sherrill must now offer sufficient evidence to show that the Oneidas are no longer entitled to possession of the properties or that it will prevail on its affirmative defenses.[10] *See id.* at 669, 99 S.Ct. at 2538.

Sherrill first argues that the Oneidas' right to possession of the properties derives from its fee title. Sherrill argues that the Oneidas' open market purchase of fee title is inconsistent with federal set aside and superintendence.[11] Sherrill cites *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), in support of this argument. In *Venetie*, the Supreme Court explained its reliance in prior cases

upon a finding of both a federal set-aside and federal superintendence in concluding that the Indian lands in question constituted Indian country and that it was permissible for the Federal Government to exercise jurisdiction over them. Section 1151 does not purport to alter this definition of Indian country, but

---

10. While Sherrill initially did not assert affirmative defenses, the currently-pending motion to amend its answer seeks to add affirmative defenses. Accordingly, the proposed asserted defenses will be evaluated below in section IV.D.1.c.

11. It is unnecessary to evaluate Sherrill's arguments relating to dependent Indian community and Indian allotment, as the Nation does not contend that the properties constitute either classification.

merely lists the three different categories of Indian country mentioned in our prior cases: Indian reservations, dependent Indian communities, and allotments.

*Id.* at 530, 118 S.Ct. at 954 (internal citations omitted). *Venetie,* however, concerns whether nonreservation land constituted a dependent Indian community and therefore Indian Country. *Id.* at 527, 118 S.Ct. at 953 (holding that two requirements, set aside and superintendence, must be met for land that is neither a reservation nor an allotment to be considered a dependent Indian community). The land at issue had formerly been reservation land, but the reservation was revoked by the Alaska Native Claims Settlement Act. *Id.* The *Venetie* Court noted that before the amendment of Section 1151 to include dependent Indian community within the statutory definition of Indian Country, the Court had held in three cases that "Indian lands that were not reservations could be Indian [C]ountry." *Id.* at 528, 118 S.Ct. at 953. In those cases, the Court required a two pronged showing: federal set aside for the use of the Indians as Indian land and federal superintendence. *Id.* at 528–530, 118 S.Ct. at 953–54.

The *Venetie* Court explained that in *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), Pueblo Indian land held in fee simple by the Pueblo, restricted from alienation by the federal government, met the set aside and superintendence requirements and constituted Indian Country, although the land was not a formal reservation. *Id.* Similarly, the Court explained that in *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), allotted lands held in trust by the federal government for the benefit of individual Indians were Indian Country despite diminishment of the reservation. *Id.* The *Venetie* Court further explained that in *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), it held that the set aside and superintendence requirements were met, where although the land was not a reservation it was held in trust for the Indians by the federal government and the government had authority to pass laws regulating the territory. *Id.* Thus, none of these cases holding that set aside and superintendence showings are prerequisites to qualify as Indian Country involved reservations.

The two-prong test set forth in *Venetie* does, however, parallel the test for establishing Indian Country status when the land in question is not a formal reservation, as set forth in *Citizen Band Potawatomi Indian Tribe,* 498 U.S. at 511, 111 S.Ct. at 910. *Roberts,* 185 F.3d at 1133. In *Roberts,* property held in trust by the government for Indian benefit, found by the lower court to be validly set aside and under federal superintendence, was Indian Country. *Id.* In *Citizen Band Potawatomi Indian Tribe,* the land in question was held for the Indians in trust by the government. 498 U.S. at 511, 111 S.Ct. at 910. The Supreme Court found that the test for Indian Country does not depend upon the denomination of the property as "trust land" or "reservation." *Id.* Accordingly, the trust land, which was validly set apart and subject to federal superintendence, "qualifie[d] as a reservation for tribal immunity purposes." [12] *Id.* at 511, 111 S.Ct. at 910.

It is apparent, therefore, that federal set aside and superintendence are required in order to find that an informal reservation is Indian Country under § 1151(a) and

---

12. The issue in the case was whether the state could impose sales tax on sales made by Indians to Indians and non-Indians on tribal trust lands. *Id.* at 507, 111 S.Ct. at 908.

that nonreservation land is a dependent Indian community. What Sherrill has not cited, and what has not been found after exhaustive research, is any case in which federal set aside and superintendence were prerequisites to a finding that a valid, formal reservation was Indian Country. To the contrary, as the aforementioned review of cases shows, it appears that there is no such requirement for federal set aside and superintendence when the property in question is a formal reservation.

The *Venetie* Court noted that it "had also held, not surprisingly, that Indian reservations were Indian [C]ountry." 522 U.S. at 528 n. 3, 118 S.Ct. at 953 n. 3. *Venetie* therefore supports the Nation's view that the set aside and superintendence requirements are inherent to a validly established reservation, and need not be separately proven to support a finding that a reservation is Indian Country. *See id.* at 528 & n. 3, 118 S.Ct. at 953 & n. 3; *Donnelly v. United States,* 228 U.S. 243, 269, 33 S.Ct. 449, 458, 57 L.Ed. 820 (1913)(stating that "in our judgment, nothing can more appropriately be deemed 'Indian [C]ountry,' . . . than a tract of land . . . lawfully set apart as an Indian reservation").

Accordingly, Sherrill's argument that the properties are not Indian Country because federal set aside and superintendence have not been shown fails. The federal government confirmed and guaranteed the Oneidas' Reservation by the Treaty of Canandaigua in 1794. Federal set aside and superintendence are inherent in that Reservation. Thus, even if it is said that such requirements apply, however doubtful that is in the case of formal reservations, then those requirements are met at the time the reservation is established. In this case, therefore, the federal set aside and superintendence requirements were met as of 1794.

Additionally, to the extent that the argument contends that fee simple title to land precludes Indian Country status it also fails. The Supreme Court has found that Indian Country status is not precluded because the Indians hold fee simple title to land. *See Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6 (rejecting argument that Indian Pueblo lands, held in fee simple by the Pueblo, cannot be Indian Country due to the fee simple title).

In reply, Sherrill extends its argument citing the ruling of April 11, 2001 (McCurn, J.), that the remedy of ejectment of current title-holders of the land that it claims is not available to the Nation. Sherrill argues that this holding, that the Nation does not have a current possessory right to the land claimed, defeats any claim it has to possession of the lands prior to purchase of fee title. Thus, Sherrill contends, the Nation cannot establish Indian title to the land or that the properties are reservation land or Indian Country.

Sherrill's argument ignores the basis for the land claim action: denial of the Nations' ancestral possessory right to the land. The argument also ignores the question upon which Judge McCurn's ruling was made: what remedies might be available to the Nation should it prove its wrongful dispossession claim. *See Oneida Indian Nation,* 199 F.R.D. at 90. The parameters of the ruling are clear: "To the extent that the Oneidas in this particular case eventually may be able to establish that they have possessory rights in the claim area, such rights do not necessarily encompass the concomitant right to obtain relief directly from the current landowners." *Id.* This ruling, therefore, does not limit the Nations' pursuit of claims to possessory rights to the land. Accordingly, it does not estop the Nation from asserting ancestral possessory rights in the properties at issue here, nor does it negate the

existence of a reservation. To the contrary, the ruling recognizes the Nations' right to pursue claims of possessory rights to its ancestral lands. *Id.; see also Oneida II,* 470 U.S. at 236, 105 S.Ct. at 1252 (holding "that the Oneidas can maintain this action for violation of their possessory rights based on federal common law."). The Supreme Court, while recognizing the Oneidas' possessory rights claim, left open whether equitable considerations might limit the available relief. *Oneida II,* 470 U.S. at 254 n. 27, 105 S.Ct. at 1262 n. 27. Judge McCurn's ruling did not foreclose the Oneidas' possessory claim; rather, he limited the relief available by foreclosing the possibility of ejectment of current landowners in the land claim area and recovery of monetary damages from current landowners. *See Oneida Indian Nation,* 199 F.R.D. at 90–94.

Also in reply Sherrill argues that the Reservation has been diminished. Sherrill contends that factors such as subsequent treatment and the pattern of settlement in the area in question must be considered in deciding whether a reservation has been diminished, in addition to congressional action. Sherrill cites *Yankton Sioux Tribe,* 522 U.S. 329, 118 S.Ct. 789, and *Solem,* 465 U.S. 463, 104 S.Ct. 1161, in support of this argument. Sherrill concedes that as surplus land act cases, these cases may not be "directly pertinent" here. (*See* Sherrill Reply Mem. at 4 n. 4, 17 n. 12.) However, Sherrill avers that the cases contradict the Nation's assertion that only congressional action may diminish a reservation. This averment is incorrect. In fact, only congressional action may diminish or disestablish a reservation. 25 U.S.C. § 177; *Cayuga Indian Nation,* 667 F.Supp. at 944 (citing *Oneida II,* 470 U.S. at 247–48, 105

S.Ct. at 1258); *Narragansett Indian Tribe,* 89 F.3d at 914.

The surplus land act cases involved interpretation of congressional acts.[13] *See, e.g., Yankton Sioux Tribe,* 522 U.S. at 343–344, 118 S.Ct. at 798; *Solem,* 465 U.S. at 464, 104 S.Ct. at 1163; *Cass County, Minn. v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 111, 118 S.Ct. 1904, 1908, 141 L.Ed.2d 90 (1998); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 585–86, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court for the Tenth Judicial District,* 420 U.S. 425, 427–28, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975); *Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent of Wash. State Penitentiary,* 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962). For example, in *Yankton Sioux Tribe* the Supreme Court stated: "Our touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose." 522 U.S. at 343, 118 S.Ct. at 798. The Court further stated that "although the most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands, we have held that we will also consider the historical context surrounding the passage of the surplus land Acts, and to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there." *Id.* at 344, 118 S.Ct. at 798 (internal quotations omitted).

It is thus clear that evaluation of the subsequent treatment and the pattern of settlement is relevant only where needed to determine congressional intent. Where, as here, there is no congressional act, congressional intent is irrelevant and the sub-

---

**13.** The acts allotted Indian lands to individual Indians or to the tribe for common tribal purposes, and opened unallotted lands to white settlers.

sequent treatment and the pattern of settlement are also irrelevant.

Sherrill, joining the amici curiae, argues that the 1838 Treaty of Buffalo Creek, a purported act of Congress, disestablished the Reservation. Oneida Ltd., the Counties, and New York State, as amici curiae, develop this argument. First Oneida Ltd. contends that the Treaty of Buffalo Creek plainly and unambiguously disestablished the Reservation. It next contends that even if the Treaty of Buffalo Creek is determined to be ambiguous, the contemporary historical context; subsequent congressional and administrative references to the reservation from the time of the claimed disestablishment until the present; historic demographic trends; the jurisdictional history of federal, state, and tribal exercises of sovereignty over the lands in dispute; and the justifiable expectations of the people living in the area are relevant and lead to the conclusion that the Reservation no longer exists.

The 1838 Treaty provided for the removal of several tribes of New York Indians from their lands in Wisconsin to territory west of the Mississippi River in what is now the State of Kansas. 7 Stat. 550. The Treaty created a reservation for the tribes in Kansas. *Id.* Art. 2. A relatively small piece of land was reserved for them in Wisconsin, while the Indians ceded the majority of their Wisconsin lands to the federal government. *Id.* Art 1. A small payment was to be made to the tribes upon their relocation to Kansas. *See New York Indians*, 170 U.S. at 3, 18 S.Ct. at 531–32. In addition to other provisions not relevant here, the Treaty provided for a payment to Oneidas still residing in New

York for "expenses incurred and services rendered" by the Oneidas in securing the Wisconsin reservation.[14] 7 Stat. 550 Art. 13. Moreover, the New York Oneidas "agree[d] to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida [New York]." *Id.*

It is the removal language that Oneida Ltd. argues plainly and unambiguously disestablished the Reservation. It argues that in every disestablishment or diminishment case of which it is aware, the tribe was permitted to remain on at least a part of the reservation, and in fact, it was anticipated that some members of the tribe would remain on the prior reservation land. Under this removal treaty, however, it argues that the Oneidas still residing in New York were obligated to remove from New York. Accordingly, Oneida Ltd. argues that this obligation to remove clearly terminated the New York Reservation. It argues that to hold otherwise would be contrary to the historical concept of removal.

■ An obligation to remove does not constitute abandonment of tribal sovereignty over the land from which the Indians are to remove, contrary to the arguments of Oneida Ltd. Rather, the actual language of the congressional act in question, in this case the Treaty of Buffalo Creek, must clearly and unambiguously indicate the intent to disestablish or diminish the reservation. *Cayuga Indian Na-*

---

**14.** This provision was presumably included because the New York Oneidas would no longer be able to take advantage of payments previously guaranteed upon their removal to the Wisconsin reservation, which was significantly diminished by the Treaty of Buffalo

Creek. In other words, since removal to Wisconsin was no longer a possibility for the New York Oneidas, reimbursement was being made for costs incurred by them in obtaining the Wisconsin reservation.

*tion,* 667 F.Supp. at 944 (citing *Oneida II,* 470 U.S. at 247–48, 105 S.Ct. at 1258).

Specific cession language has been required in order to make a finding of reservation diminishment. For example, language that the tribe would "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands" terminated reservation status. *Yankton Sioux Tribe,* 522 U.S. at 344, 118 S.Ct. at 798. The Court distinguished cases in which the language did not indicate a clear intent to diminish a reservation. Thus, where acts "declar[ed] surplus land 'subject to settlement, entry, and purchase' " congressional intent to diminish the reservation was not found. *Id.* at 345, 118 S.Ct. at 799 (quoting *Seymour,* 368 U.S. at 355, 82 S.Ct. at 426–27; *Mattz,* 412 U.S. at 501–02, 93 S.Ct. at 2256–57). The Court also refused to "read a phrase authorizing the Secretary of the Interior to 'sell and dispose' of surplus lands" as cession language. *Id.* (quoting *Solem,* 465 U.S. at 472, 104 S.Ct. at 1167.)

In contrast to the cession language in *Yankton Sioux Tribe,* the Treaty of Buffalo Creek simply states an agreement to remove to Kansas. The language of Article 13 cannot be read as clearly and unambiguously ceding the Oneidas' New York lands. *See* 7 Stat. 550 Art. 13; *Yankton Sioux Tribe,* 522 U.S. at 344, 118 S.Ct. at 798. To the contrary, the language clearly and unambiguously is not cession language. *See Yankton Sioux Tribe,* 522 U.S. at 344–45, 118 S.Ct. at 798–99. Further, the Supreme Court has found that a fixed payment in "sum certain" language adds credence to cession language. *Id.* at 344, 118 S.Ct. at 798. In Article 13, no payment is provided; rather, the removal was only to take place *"as soon as they can make satisfactory arrangements with the Governor of the State of New York for the*

*purchase of their lands at Oneida."* 7 Stat. 550 Art. 13 (emphasis added). This language in no way bolsters the removal language to make it reflect any intent to disestablish the Reservation. There clearly is no "total surrender of tribal claims in exchange for a fixed payment" in the Treaty of Buffalo Creek related to the Oneidas' New York lands. *See Yankton Sioux Tribe,* 522 U.S. at 345, 118 S.Ct. at 799.

Also instructive is the reasoning in *New York Indians.* In that case the Supreme Court evaluated the Treaty of Buffalo Creek language to determine if it reflected an intent for the Indians to forfeit the Kansas reservation if they failed to remove there. 170 U.S. at 24–25, 18 S.Ct. at 536–37. The Court determined that the use of present tense in the granting clause meant that an immediate interest in the land was conveyed. *Id.* at 17, 18 S.Ct. at 534. The Court analyzed the cession language pertaining to the Wisconsin lands; the specific description of the Kansas lands that were to become the new reservation; the language of the habendum clause; the special provision for the New York Senecas and the sale of their land in New York; the set off of land for the Tuscaroras and the conveyance of trust land to be held for them; and determined that present title in the Kansas lands was conveyed. *Id.* at 19–21, 18 S.Ct. at 535. Because title passed to the Indians at the time the Treaty was made, a mere failure to assert title did not work a forfeiture of the title. *Id.* at 34, 18 S.Ct. at 540. Accordingly, the Court directed that a judgment be entered for the amount received by the government when it sold the lands. *Id.* at 36, 18 S.Ct. at 541.

Notably, the Supreme Court made a painstaking analysis of the Treaty of Buffalo Creek, specifically detailing its provisions. *Id.* at 15–21, 18 S.Ct. at 533–35. The Court evaluated the divestiture of

New York lands by the Senecas, in Article 10, and the set off in trust of New York lands for the Tuscaroras, in Article 14. *Id.* at 21, 18 S.Ct. at 535. In discussing these articles, the Court stated: "These proceedings, by which these tribes devested themselves of their title to lands in New York" indicated the intent for the tribes to take immediate possession of the Kansas lands. *Id.* Of importance is the Court's failure to mention that any Oneida New York land was devested by this Treaty. *See id.* If Article 13 in fact worked a devestiture of the Oneidas' New York lands, it stands to reason that the Supreme Court would have mentioned that fact when performing this detailed analysis.

The only mention of Article 13 by the Court is in a discussion of the possibility that even if a forfeiture occurred by executive action, the contingency (Indians failing to agree to remove) to affect the forfeiture had never occurred. *Id.* at 25–26, 18 S.Ct. at 537. In other words, forfeiture was conditioned "not upon the actual removal ... to Kansas," but rather upon agreement to remove. *Id.* at 26, 18 St. Ct. at 537. The Court cited Article 13 as signifying the Oneidas' agreement to remove, thus technically performing the condition precedent. *Id.*

 Oneida Ltd. argues that no court has found tribal sovereignty surviving an obligatory removal treaty, and contends that to do so would "logically open up over 100 million acres of lands east of the Mississippi River" to claims of "ongoing tribal sovereignty, jurisdiction, and regulatory authority over the lands, waters, natural resources, and peoples within these areas." (Oneida Ltd. Mem. at 15.) It is this type of contention that "engenders inflamed passions on all sides." *Oneida Indian Nation,* 199 F.R.D. at 65. Moreover, the contention is baseless. It has been determined that ejectment, or in other words recovery of actual possession, of the Reservation lands is not a viable remedy in the Oneidas' land claim action. *Id.* at 90. It may be that courts would also determine that such a remedy is not viable in similar suits in other areas. It is also well settled that tribal jurisdiction is limited to Indians and Indian land, and the state retains jurisdiction over non-Indians and land which is not Indian Country. *See Sac & Fox Nation,* 508 U.S. at 128, 113 S.Ct. at 1993; *Citizen Band Potawatomi Indian Tribe,* 498 U.S. at 513, 111 S.Ct. at 911. Further, non-Indian communities even within the boundaries of a reservation are not Indian Country, *Weddell v. Meierhenry,* 636 F.2d 211, 213 (8th Cir. 1980), so there would be no dispute over applicable jurisdiction.

Oneida Ltd. cites *Menominee Indian Tribe v. Thompson,* 161 F.3d 449 (7th Cir. 1998), in support of its contention that obligatory removal treaties always extinguish rights to the lands from which the Indians agree to remove. The Menominee Tribe ceded their lands around the Fox River in Wisconsin by treaty in 1831. *Id.* at 458. The 1831 Treaty also preserved the Menominees' right to fish and hunt on certain portions of the ceded land, without interference or regulation by the state. *Id.* In 1848 the Tribe entered into another treaty, ceding all of its lands in Wisconsin, obtaining new lands in Minnesota, and agreeing to remove to Minnesota. *Id.* The court found that the Menominees had unambiguously ceded all of its Wisconsin land, including the previously reserved rights to hunt and fish near the Fox River. *Id.* at 457–58. In following the canon of construction that treaties must be interpreted as the Indians would have understood them, the court noted that the Menominees "could not reasonably have expected to continue hunting and fishing on the land ceded in 1848,

considering the Tribe had just agreed to leave the Wisconsin land and move to the Minnesota reservation approximately 300 miles away." *Id.* at 458.

The cession language in the Menominees' 1848 Treaty, "agree to cede, and do hereby cede, sell, and relinquish to the United States all their land in the State of Wisconsin wherever situated," was clear and unambiguously reflected an intent to relinquish all rights to the Wisconsin land. *Id.* In contrast, the Treaty of Buffalo Creek language, "agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida," contains no cession language. Accordingly, *Menominee Indian Tribe* is not helpful to Oneida Ltd.'s argument.

More closely analogous are *New York Indians* and *Donnelly*. In *New York Indians*, the Supreme Court found that the New York Indians' refusal to remove to the new territory did not devest them of the rights to the new reservation. 170 U.S. at 34–35, 18 S.Ct. at 540–41. In *Donnelly*, it was argued that creation and maintenance of a school district on a reservation changed the status of the land. 228 U.S. at 267, 33 S.Ct. at 457. The Supreme Court found that the existence of the county school district had no significance in its evaluation of Indian Country status. *Id.* at 267–68, 33 S.Ct. at 457. Here, an agreement to remove cannot be construed as relinquishment of rights in land.

Even if the Treaty of Buffalo Creek is considered an obligatory removal treaty, absent cession language it cannot be construed as ceding the Nation's New York lands. *See, e.g., Yankton Sioux Tribe*, 522 U.S. at 344, 118 S.Ct. at 798; *see also Menominee Indian Tribe*, 161 F.3d at 458 (interpreting "to cede, and do hereby cede, sell, and relinquish" as clearly ceding

lands). Lacking cession language, the Treaty of Buffalo Creek unambiguously did not disestablish the Reservation. In other words, the Treaty of Buffalo Creek did not alter the reservation status of the Oneidas' New York lands. Even if the Treaty of Buffalo Creek language could possibly be considered ambiguous as to intent to affect the Oneidas' New York lands, according to the well-settled canons of construction such ambiguity must be resolved in favor of the Indians. *Oneida II*, 470 U.S. at 247, 105 S.Ct. at 1258. Further, a finding of disestablishment or diminishment must not be lightly implied. *Id.* at 248, 105 S.Ct. at 1258. Thus, with the applicable canons of construction in mind, the language of the Treaty, even if ambiguous, must be construed to have intended no disestablishment of the Oneidas' New York lands.

The amici curiae, however, argue that if the Treaty of Buffalo Creek is not considered an unambiguous relinquishment of the Reservation, then it should be considered ambiguous as to that issue. The amici then point to the force of time and law in an attempt to find congressional intent to disestablish or diminish the Reservation. Given that the unambiguous language of the Treaty clearly does not indicate relinquishment of the New York land, it would not be proper to rely upon demographics and jurisdictional history to find disestablishment. *Hagen v. Utah*, 510 U.S. 399, 440–41, 114 S.Ct. 958, 980, 127 L.Ed.2d 252 (1994)(Blackmun, J., dissenting)("Absent other plain and unambiguous evidence of a congressional intent, we never have relied upon contemporary demographic or jurisdictional considerations to find diminishment."). To find that the historical context and demographics indicate congressional intent to disestablish the Reservation with absolutely no language whatsoever in the Treaty that could possi-

bly be read to infer such intent flies in the face of the law, as well as logic and common sense. Here, the Treaty language is not ambiguous and therefore considering historical context and demographics is not warranted.

However, several arguments of the amici deserve mention. Oneida Ltd. posits that historical, equitable, and practical concerns require a finding against the Nation. It seems that this argument calls for ignoring the law and succumbing to political pressures. As noted above, it is in the purview of the executive and legislative branches, not the judiciary, to make such determinations. *See Cherokee Nation*, 174 U.S. at 483, 19 S.Ct. at 736.

Oneida Ltd. further suggests that a finding in favor of the Nation would upset the justifiable expectations of 70,000 non-Indian residents in the area. As previously noted, such scare tactics will be to no avail in this forum. Moreover, they are groundless, as any decision rendered in this action will apply narrowly to the parcels at issue in the lawsuit, which are currently possessed by the Nation. If a finding is made that those parcels constitute a viable reservation and are Indian Country, then by definition they are inalienable by the Nation without the approval of the federal government. (*See* First Carmen Aff. Ex. 12–15.) Tribal jurisdiction will apply only on the parcels affected by the decision. Further, any decision rendered here will apply to the Nation and not to any private landowners.

Amici present statistics and evidence to show that historically for many years the state has asserted jurisdiction over the area and the area is populated by many non-Indians and few Indians. This evidence is set forth to support the argument that the force of time and law has *de facto* diminished the Reservation. The Supreme Court has recognized that although settle-ment by non-Indians may degrade the Indian character of a reservation, that is not necessarily determinative of whether the reservation status of the lands has changed. *See Yankton Sioux Tribe*, 522 U.S. at 336, 118 S.Ct. at 804.

The reliance on this historical data also exhibits logical faults. Out of aboriginal lands of six million acres, the Reservation originally created consisted of 300,000 acres. Approximately 100,000 acres were illegally purchased by New York State in 1795. *See Oneida II*, 470 U.S. at 229–33, 105 S.Ct. at 1249–50. Approximately twenty-five other allegedly illegal purchases are at issue in the land claim litigation.

First, by the time of the 1838 Treaty of Buffalo Creek, the Oneidas only retained 5,000 acres. To say, as Sherrill and the amici wish, that the 1838 Treaty disestablished a reservation of 300,000 acres, when at the time the Oneidas entered into the Treaty they possessed only 5,000 acres, defies logic. How possibly could those Oneidas have intended to relinquish their rights to 295,000 acres when they did not know they had such rights?

Second, the Oneidas had been dispossessed of most of their land, they claim illegally, by the time periods for which demographic and jurisdictional evidence is presented. The reason that non-Indians settled on the land and the state asserted jurisdiction was because the Oneidas had been dispossessed, possibly illegally. How can this be considered as evidence of congressional intent to disestablish the Reservation?

Another argument is that the federal policy at the time, 1838, was to remove the Indians from the east to the territories in the west. This policy, New York State argues, supports the construction of the Treaty of Buffalo Creek as a whole to

reflect the intent to disestablish the Oneidas' New York Reservation. However, reading the Treaty as a whole indicates that when there was an intent to cede land, the language clearly so stated. For example, Article 1, in reference to the Wisconsin reservation previously acquired for the New York Indians from the Menominees, states that the Indians "cede and relinquish to the United States all their right, title and interest to the lands" in Wisconsin. 7 Stat. 550 Art. 1. Article 2 provides the consideration for the cession of Article 1. *Id.* Thus, had the parties to the Treaty of Buffalo Creek intended a cession of the Oneida land in New York, the language to use to do so was known to them and at their disposal. *See Mattz,* 412 U.S. at 504 & n. 22, 93 S.Ct. at 2257–58 & n. 22 (discussing examples of clear language of express termination). Moreover there is no legal authority for interpreting a treaty as relinquishing rights to Indian lands based solely on federal policy, in the complete absence of cession language in the treaty.

New York State relies upon *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), in support of the argument that jurisdictional conflicts between the state and tribal authorities was a problem that the removal policy sought to eliminate. In *Worcester,* the Supreme Court found that the Cherokee Nation maintained sovereignty over its peoples and lands, and that Georgia's assertions of jurisdiction in contravention of such sovereignty were void. *Id.* 31 U.S. at 561. The Court reasoned that the Constitution, in conferring upon Congress the power of making treaties and regulating commerce with the Indian tribes, left the sole right of dealing with the Indians in the federal government, thereby precluding a state from unilaterally asserting jurisdiction over the Indians. *Id.* at 558–61. The Court noted that the states

acquiesc[ed] in the universal conviction that the Indian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States, with their consent: that their territory was separated from that of any state within whose chartered limits they might reside, by a boundary line, established by treaties: that, within their boundary, they possessed rights with which no state could interfere: and that the whole power of regulating the intercourse with them, was vested in the United States.

*Id.* at 560. New York State reasons from *Worcester* that, as reservation status and jurisdiction went hand in hand, by obligating the Oneidas to remove from New York, there was an intent to terminate tribal jurisdiction and thereby disestablish the Reservation. This argument and reasoning completely ignores the message of *Worcester* that only the federal government has the authority to terminate the tribal jurisdiction and disestablish a reservation. It ignores all of the canons developed by the Supreme Court for making determinations of congressional intent when dealing with Indians, such as requiring plain and unambiguous expression of intent to terminate Indian title. *See, e.g., Oneida II,* 470 U.S. at 247–48, 105 S.Ct. at 1258. It ignores the overriding federal policy of protecting the Indians and their lands. *See, e.g., id.*

These Indian tribes are the wards of the nation.... From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen.... The power of the general

government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes.

*United States v. Wright*, 53 F.2d 300, 305 (4th Cir.1931)(quoting *United States v. Kagama*, 118 U.S. 375, 383–85, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886)). It also ignores the simple definition of remove. Remove does not mean terminate.

In sum, the Nation has set forth undisputed evidence that the 1794 Treaty of Canandaigua confirmed and guaranteed its Reservation, which encompasses the lands at issue here. There is no evidence of any congressional act that disestablished the Reservation between 1794 and the present day. Accordingly, this land is Indian Country and is not taxable by Sherrill and the Counties.

### D. *Application of Indian Country Finding*

#### 1. *Lead Case*

##### a. *Sherrill's Motion for Summary Judgment or Alternative Injunctive Relief*

Sherrill contends it is entitled to summary judgment solely based upon the properties at issue being found not to be Indian Country pursuant to § 1151. Because it has been found that the properties are Indian Country, Sherrill's motion for summary judgment must be denied.

■■■ In the alternative Sherrill seeks a preliminary injunction maintaining the *status quo ante*. Sherrill wishes to enjoin the Nation from purchasing additional properties or expanding the properties it currently owns.

■■■ A preliminary injunction should issue only where the party seeking such relief shows "that it is likely to suffer irreparable injury if relief is denied [and] also that there is either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [movant's] favor." *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 118 (2d Cir.1984); *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999).

Sherrill argues that absent an injunction it is in imminent danger of losing its tax base and its power to govern the property owners within the City. Sherrill posits irreparable harm will result from its inability to collect property tax or sales tax from the businesses already operated by the Nation, and from it being forced to provide municipal services to homes and business that do not contribute to the tax base.

The Counties, as amicus curiae, also contend that absent injunctive relief harm will be irreparable. The Counties assert that the Nation's purchases of land are accelerating, it having purchased 13,000 acres since 1987. As the Nation acquires more land, the tax base shrinks. The Counties argue that the resulting shortfalls in tax revenue will cause deficiencies in public services to the citizenry, including law enforcement, emergency services, and highway maintenance. The Counties further claim harm from the Nation's assertion of sovereignty over the land, asserting that irreparable damage to the body politic will result from a checkerboard jurisdictional pattern.

Both Sherrill and the Counties contend that, additionally, the harm is irreparable because the Nation's sovereign immunity will insulate it from any claim for damages in the future. While this may be true, it is irrelevant unless Sherrill can establish harm.

Sherrill's contention that it is on the verge of extinction is exaggerated. Sherrill has had budget surpluses for the last five years. (First Carmen Aff. Ex. 31.) Sherrill retorts that each year its surplus becomes less and less. Sherrill's financial condition is not indicative of being on the brink of bankruptcy, and is not supportive of a claim of irreparable harm.

Also failing to establish irreparable harm are the arguments made by Sherrill and the Counties that the fact that Nation land does not contribute to the tax base causes deficiencies in services such as law enforcement and fire protection. First, neither Sherrill nor the County cites to a particular instance, or even to general circumstances, where some budget shortfall caused by the Nation's refusal to pay property tax resulted in failure by the municipalities to provide municipal services. Second, over $30 million worth of Sherrill property is tax exempt, not including the Nation property at issue here, which may account for some budget shortfall. (First Carmen Aff. Ex. 32.)

Sherrill has not adequately shown irreparable injury in order to entitle it to preliminary injunctive relief. *See Otokoyama Co.,* 175 F.3d at 270. Further, based upon the foregoing finding that the properties are Indian Country, Sherrill has failed to show a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in Sherrill's favor. *See id.* Accordingly, Sherrill's request for alterna-tive preliminary injunctive relief must be denied.

#### b. *Nation's Cross-motion for Summary Judgment*

The Nation cross moves for summary judgment on its taxation claim, its due process claim, and Sherrill's counterclaims against it.

#### (1) *Taxation Claim*

The basis for the Nation's taxation claim is that the property is Indian Country and therefore is not taxable. Based upon the finding that, as a matter of law, the properties at issue are Indian Country and thus are not taxable, the Nation is entitled to judgment on that claim.

Sherrill argues that summary judgment cannot be granted in favor of the Nation, as it rests upon a number of disputed factual assertions, for which additional discovery is required. Sherrill suggests that at dispute are (1) whether the properties are within the Reservation boundaries confirmed by the Treaty of Canandaigua; (2) circumstances regarding transfers of the properties from 1794 until the present day including possible federal governmental approval; (3) whether the 1805 and 1807 transactions referenced by the Nation actually encompasses the properties; (4) whether the Nation has maintained continuous tribal status since 1794, for the purposes of the Nonintercourse Act; (5) the circumstances surrounding the government's alleged recognition of land referenced in the Carmen Aff. Ex. 13–15; (6) whether the Nation's claim is factually barred by laches, estoppel, waiver, statute of limitations, unclean hands, or consent; (7) whether there was ratification of transfers that the Nation claims are invalid; and (8) whether the 1838 Treaty of Buffalo Creek or other treaties extinguished the

1794 Reservation. Sherrill relies upon Fed R. Civ. P. 56(f), which provides

*When Affidavits are Unavailable.* Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The documents and depositions into which Sherrill posits that it needs additional discovery point out the illusorious nature of its contention that discovery is now required on these points. For example, Sherrill avers that it needs discovery of documents and expert depositions relating to whether the proprieties are within the 1794 Treaty boundaries. (Sacks Aff. ¶ 4.) Any such documents are a part of the public record and thus readily available for Sherrill to cite in opposition to the Nation's cross motion. It is also notable that the Nation adduced expert evidence that in fact the properties are within the 1794 Treaty boundaries. (*See* Thomas Decl.) Sherrill also avers the need for discovery of documents and expert depositions relating to whether Congress has ratified or otherwise modified, eliminated, or terminated the 1794 Treaty. (Sacks Aff. ¶ 4.) The Congressional Record is and has been available for Sherrill to determine if Congressional action regarding the Reservation has occurred since 1794. Permitting it further discovery into these areas would not be permissible pursuant to Rule 56(f), as such discovery was available prior to the time the motion was briefed.

Sherrill further contends that it requires discovery regarding the 1805 and 1807 transfers of the properties in question. (Sacks Aff. ¶ 5.) The Nation has adduced evidence that these transfers did involve the properties in question. (*See* Thomas Decl.) In order to withstand summary judgment on this point, Sherrill must do more than conclusorily assert the need to look for additional documentation on these transfers. In a similar manner Sherrill contends that it needs additional discovery to determine whether the Nation in fact has enjoyed continuous tribal status since 1794, a prerequisite for protection of the Nonintercourse Act. (Sacks Aff. ¶ 7.) However, Sherrill has adduced no facts to indicate that the Nation has not enjoyed such status, in the face of significant factual support in favor of the Nation's continued tribal status. Sherrill in no way indicates the reason for its failure to adduce opposing facts, nor how any delay would help it to do so. For example, Sherrill does not state what documents, nor even what type of documents, may provide facts that would create a question as to whether the Nation has maintained continuous tribal status. In a similar manner Sherrill fails to state a reason for its failure to have other facts available that are essential to its opposition.

Sherrill does mention what it considers an inadequate response to interrogatories posed to the Nation. (Sacks Aff. ¶ 12.) However, Sherrill does not include a reference in the record to the interrogatories and responses such that they could be considered in determining what additional discovery may be warranted by any inadequate responses. *Id.* Additional discovery pursuant to Fed.R.Civ.P. 56(f) is not warranted in these circumstances.

### (2) *Due Process Claim*

In its due process claim the Nation avers that the original notice of the tax delinquency and potential tax sale was insufficient in that it did not identify specific parcels that were to be subject to tax sale,

and that newspaper publication of the redemption period was insufficient because it was not personal service and it was not timely. Further, the Nation argues that personal notice served on the Nation a short time before the expiration of the redemption period was untimely. In opposition, Sherrill contends that the Nation had ample actual notice of the foreclosures and sales, and that the Nation did not have and will not have in the future any intention of paying the assessed taxes or redeeming the properties.

■■■■■ Due process requires that notice of a tax sale be mailed to a property owner whose name and address are known. *McCann v. Scaduto,* 71 N.Y.2d 164, 176, 524 N.Y.S.2d 398, 519 N.E.2d 309 (N.Y.1987). Notice by publication is insufficient. *Id.* at 175–76, 524 N.Y.S.2d 398, 519 N.E.2d 309. Notice by mail of a redemption period is also required. *Yagan v. Bernardi,* 256 A.D.2d 1225, 1226, 684 N.Y.S.2d 117 (4th Dep't 1998). Providing notice by mail closer to the expiration period than the regulatory scheme provides does not comport with due process. *Id.; McCann,* 71 N.Y.2d at 177–178, 524 N.Y.S.2d 398, 519 N.E.2d 309. The notice must sufficiently describe the property such that the property can be found. *Kiamesha Dev. Corp. v. Guild Props., Inc.,* 4 N.Y.2d 378, 387, 175 N.Y.S.2d 63, 151 N.E.2d 214 (N.Y.1958). A description which permits identification and location of the property with reasonable certainty is adequate. *S.A.B. Enters., Inc. v. Stewart's Ice Cream Co.,* 187 A.D.2d 875, 876, 590 N.Y.S.2d 568 (3d Dep't 1992). Finally, "the nature of tax sales is such that the owner's title should not be divested unless the statutory requirements are 'strictly observed.' " *Kiamesha Dev. Corp.,* 4 N.Y.2d at 389, 175 N.Y.S.2d 63, 151 N.E.2d 214 (quoting *Helterline v. People,* 295 N.Y. 245, 251, 66 N.E.2d 345 (1946)).

■■■ On August 7, 1997, Sherrill mailed to the Nation three notices of tax delinquency. (First Carmen Aff. Ex. 17.) None of the three notices specified any description whatsoever of properties to which the delinquencies pertained. *Id.* Such notices, with no description of the property affected, do not provide due process. *See Kiamesha Dev. Corp.,* 4 N.Y.2d at 387, 175 N.Y.S.2d 63, 151 N.E.2d 214; *S.A.B. Enters., Inc.,* 187 A.D.2d at 876, 590 N.Y.S.2d 568. Sherrill published a notice of tax sale for these properties; however, it did not provide notice to the Nation of the impending sale. The tax sale was held on November 5, 1997. According to the Sherrill Charter, a two-year redemption period would follow the tax sale. Sherrill's notice by publication in November 1999, of the upcoming February 8, 2000, expiration of the redemption period, was untimely. On January 10, 2000, Sherrill personally served notice on the Nation of the expiration of the redemption period. The one-month notice of the expiration of the redemption period is insufficient to comport with due process. *See McCann,* 71 N.Y.2d at 177–178, 524 N.Y.S.2d 398, 519 N.E.2d 309; *Yagan,* 256 A.D.2d at 1226, 684 N.Y.S.2d 117. Similarly, Sherrill's notices to the Nation on March 6, 2000, of impending redemption period expiration dates of November 5, 2000, and November 10, 2000, failed to provide the Nation due process. *See McCann,* 71 N.Y.2d at 177–178, 524 N.Y.S.2d 398, 519 N.E.2d 309; *Yagan,* 256 A.D.2d at 1226, 684 N.Y.S.2d 117.

Sherrill cites *Greaney v. Springer,* 266 A.D.2d 707, 701 N.Y.S.2d 450 (3d Dep't 1999), in support of its argument that because the Nation actually knew of the foreclosures and tax sales, technical deficiencies in Sherrill's notice to the Nation should not render the tax sales invalid. In *Greaney,* the plaintiffs argued that notices received in 1993 and 1994 were legally

insufficient because there was no mention of a sale. 266 A.D.2d at 708. The *Greaney* Court found this argument meritless because plaintiffs had indisputably been given notice of the impending sale in 1996. *Id.* The plaintiff's argument that lack of a specific sale date on the 1996 notice rendered the notice invalid was also rejected, because the sale was actually postponed, at plaintiffs' request, for approximately seven months to afford them a chance to pay the delinquency before the sale. *Id.*

*Greaney* is distinguishable on two grounds. First, the technical deficiencies, rejected as a basis for setting aside the tax sale, were relatively minor when looking at all the circumstances. For example, the tax sale was not set aside because earlier notices did not mention the possibility of a sale when a later notice clearly did notify plaintiffs of the sale. 266 A.D.2d at 708. In this case a claimed deficiency was that notices of delinquency failed to identify any properties that could become subject to a tax sale. Another claimed deficiency in this case was that a two-year redemption period was cut down to two months in one instance and less than two years in all instances. These are not minor technicalities. Second, there was no question in *Greaney* that the municipality provided notice to the plaintiffs and actually postponed the sale at their request. *Id.* Here, however, one of the major complaints is lack of notice, in particular of the expiration of the redemption period, in any timely manner. Accordingly, *Greaney* is not controlling under the facts of this case.

Sherrill cites no other authority that would excuse its failure to provide due process. Sherrill does posit that even if due process was not provided, the only remedy available to the Nation is an additional time period within which to pay its delinquent taxes. *See McCann,* 71 N.Y.2d at 178, 524 N.Y.S.2d 398, 519 N.E.2d 309.

■ The Nation's remedy for the due process violations in the tax sales is to void the tax sales, declare the deeds a nullity, and provide it an opportunity to redeem the properties. *Id.* Opportunity to redeem the properties is not a viable remedy here, however, as it has been determined that Sherrill had invalidly assessed the taxes on sovereign land. Accordingly, the Nation's remedy should also include a declaration that the tax assessments, delinquencies, and sales are null and void.

### (3) *Counterclaims*

The Nation seeks summary judgment on Sherrill's counterclaims as well. The Nation contends that the counterclaims are barred by sovereign immunity. Sherrill argues that the Nation has not made the requisite showing that it is a federally recognized Indian tribe, and therefore this motion must be denied. However, the record is replete with evidence showing the Oneidas to be a federally recognized Indian tribe, protected by sovereign immunity. Case law also exists to that effect. *See, e.g., Oneida Indian Nation,* 434 F.Supp. at 538. Sherrill has admitted that it is a federally recognized Indian tribe. (Ans.¶ 5.) Sherrill cannot now contend that the Nation is not a federally recognized tribe possessing the protection of sovereign immunity.

■ Sherrill further argues that it would be fundamentally unfair to apply the doctrine of sovereign immunity where, as here, the sovereign brought claims against the party in federal court but claims immunity from the party's counterclaims. Sherrill argues that on this basis the Nation should be estopped from asserting sovereign immunity as a defense. However, Sherrill cites no law to support this argument. In fact, this is not the law. Rather, an Indian tribe is protected, by sovereign immunity, from compulsory

counterclaims in a suit it has brought in federal court. *Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 509–10, 111 S.Ct. at 909 (rejecting the state's argument that by bringing the suit to enjoin the state from assessing its sales tax, the tribe waived its sovereign immunity). Thus, the Nation is not estopped from asserting sovereign immunity as an affirmative defense.

Accordingly, Sherrill's counterclaims are barred by the Nation's sovereign immunity. The Nation is entitled to summary judgment on its taxation and due process claims. It is further entitled to summary judgment dismissing the counterclaims brought against it.

### c. *Sherrill's Motion to Amend its Answer*

Sherrill seeks permission to amend its answer to assert the following affirmative defenses: laches, promissory and equitable estoppel, waiver, statute of limitations, ratification, and *in pari delicto*. The Nation contends that such amendment would be futile.

Leave to amend a complaint should be freely given. Fed.R.Civ.P. 15(a). Several factors may be considered when determining whether to permit an amendment. *Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir.1995); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234, 235 (2d Cir.1995). Normally in the absence of " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment' " leave to amend should be granted. *Rachman Bag Co.*, 46 F.3d at 234 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Undue delay or futility of amendment, inter alia, would be

grounds upon the which the amendment should be denied. *Nerney*, 66 F.3d at 28.

The equitable doctrine of laches bars lawsuits brought after inordinate delay. *See Oneida II*, 470 U.S. at 244–45, 105 S.Ct. at 1256–57; *Oneida Indian Nation*, 434 F.Supp. at 541–42. Laches, however, is not an available defense in actions brought by Indians, or by the United States on behalf of Indians, to protect their rights to their lands. *Oneida Indian Nation*, 434 F.Supp. at 541–42; *Seneca Nation of Indians v. State of New York*, No. 93–CV–688A, 1994 WL 688262, at *2 (W.D.N.Y. Oct.28, 1994); *see also Oneida II*, 470 U.S. at 244–45 & n. 16, 105 S.Ct. at 1256–57 & n. 16 (explaining that although the issue was not before the Court, it is doubtful that laches would bar such a suit). This is so due to the special trust relationship between the government and the Indians, and the federal statutory protection against the alienation of Indian land without congressional action. *Oneida Indian Nation*, 434 F.Supp. at 541–42; *see also Oneida II*, 470 U.S. at 244–45 & n. 16, 105 S.Ct. at 1256–57 & n. 16.

> And in respect to the rights of Indians in an Indian reservation, there is a special reason why the Indians' property may not be lost through adverse possession, laches or delay. This ... arises out of the provisions of Title 25 U.S.C.A. § 177, R.S. § 2116, which forbids the acquisition of Indian lands or of any title or claim thereto except by treaty or convention.

*Oneida Indian Nation*, 434 F.Supp. at 542 (quoting *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 334 (9th Cir.1956))(internal citation omitted). Sherrill cites no contrary authority. Accordingly, it would be futile to permit Sherrill to amend its answer to add the affirmative defense of laches.

Sherrill argues that waiver and promissory and equitable estoppel are also viable defenses. Sherrill contends that the Nation's claim to the land "since time immemorial" is inconsistent with open market purchases and therefore waiver and estoppel are valid defenses. However, the same federal policy of protecting the Indians and their rights to their land that precludes a defense of laches also precludes waiver and estoppel defenses. *See Seneca Nation of Indians*, 1994 WL 688262, at *2. Again, Sherrill cites no authority for its proposition that these defenses are available in a claim by Indians relating to their rights to their land free from taxation. Amending Sherrill's answer to add the defenses of waiver and estoppel would be futile.

The *in pari delicto* defense applies where there is mutual wrongdoing, giving rise to a supposition in favor of the defending party. *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1089–90 (2d Cir. 1997). Here there is no asserted wrongdoing on the part of either party. Rather, it is simply a matter of whether the properties in question are taxable by Sherrill. As Sherrill states, the only question here is whether the properties are Indian Country. The *in pari delicto* defense is not applicable. Any amendment to add this defense would be futile.

No statute of limitations governs actions by Indians to enforce property rights. *Oneida II*, 470 U.S. at 240, 105 S.Ct. at 1254; *Seneca Nation of Indians*, 1994 WL 688262, at *1. Thus, there would be no statute of limitations bar to an action by the Nation to enforce the right to maintain its property free from taxation by Sherrill. Sherrill cites no contrary law. Any amendment to add a statute of limitations defense would be futile.

The final defense Sherrill wishes to assert is ratification. Sherrill argues that it need not specify, prior to discovery, which of the twenty five treaties executed between 1795 and 1846 between the Oneidas and New York State it believes will show that Congress ratified the 1805 and 1807 conveyances. Ordinarily amendment of pleadings to add available affirmative defenses would be permissible without factual support. However, here there was a pending summary judgment motion. The Nation, in support of its motion for summary judgment, adduced factual support for a finding that the properties are in fact Indian Country. (*See* Thomas Decl.) The burden then became Sherrill's to adduce sufficient facts to the contrary. A ratification defense necessarily must be based upon a congressional act. *See Oneida II*, 470 U.S. at 246–48, 105 S.Ct. at 1257–58. Further discovery is unnecessary, as the treaties have been available. Sherrill failed to meet its burden of pointing out some express language indicating congressional intent to ratify the conveyances in issue and thus change the status of the Reservation. *See id.* Accordingly, permitting Sherrill to now assert a ratification defense would be antithetical to summary judgment motion practice.

### 2. *Eviction Case*

The Nation also seeks summary judgment on the petition for eviction brought against it by Sherrill on the basis of sovereign immunity. As discussed above, the Nation is entitled to sovereign immunity from suit. *Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 509–10, 111 S.Ct. at 909. Accordingly, the Nation is entitled to summary judgment dismissing the petition for eviction.

### 3. *Member Case*

The Nation representatives move to stay this action pending resolution of the Lead Case; or in the alternative to dismiss the

suit for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to join an indispensable party pursuant to Fed.R.Civ.P. 19(b). Based upon the foregoing determination that the properties in question constitute Indian Country and are not taxable, the motion to stay is moot. Accordingly, the motion to dismiss will be addressed.

### a. *Failure to State a Claim*

■ The Nation representatives argue that they are entitled to the same sovereign immunity as the Nation enjoys, in their official capacities. The Nation representatives also argue that Sherrill's attempts to hold them individually liable for property tax payments and sales tax collection are contrary to New York State law. Accordingly, the Nation contends that Sherrill's complaint fails to state a claim.

Sherrill argues that it is not attempting to hold the Nation representatives personally liable for the actions of the Nation or for the payment or collection of taxes; rather, it is claiming that the Nation representatives have been unjustly enriched by the Nation's failure to pay property taxes and collect state sales taxes. Sherrill further argues that sovereign immunity does not apply to individual Nation members where, as here, their acts are *ultra vires*. Finally, Sherrill argues that the Nation, the State, and other Sherrill landowners are not indispensable parties.

A cause of action shall not be dismissed for failure to state a claim under Fed. R.Civ.P. 12(b)(6), "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion brought pursuant to Fed.R.Civ.P.

12(b), the court must assume all of the allegations in the complaint are true. *Id.*

A review of the complaint makes clear the nature of Sherrill's action against the Nation representatives. Sherrill seeks a declaration that it can lawfully impose and collect property taxes from the Nation representatives and that they and the Nation are in violation of state law for failure to collect and remit state sales tax on sales made to non-Indians. Sherrill further seeks eviction, damages for unjust enrichment based upon the receipt and use of municipal services, injunctive relief prohibiting the Nation from making additional purchases of property within Sherrill, and injunctive relief prohibiting the Nation from expanding current structures or constructing new buildings on the properties. These claims mirror almost to the letter the counterclaims in the Lead Case. As has already been determined, the Nation is entitled to sovereign immunity on those counterclaims. It therefore appears that Sherrill is making the very same claims, albeit cloaked in unjust enrichment language, against the Nation representatives in an effort to avoid the sovereign immunity bar.

Sherrill relies upon *Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 514, 111 S.Ct. at 912, in support of its proposition that it can sue to enforce the state sales tax and it can sue the individual Nation representatives. In that case, the Supreme Court found that the state did have the authority to enforce its sales tax on sales made to non-Indians on the reservation. *Id.* at 512, 111 S.Ct. at 911. It did not hold that a local municipality can sue to enforce the collection of sales tax imposed by the state. *See id.* Sherrill argues it is not attempting to enforce state sales tax collection. Rather, it suggests it should be able to recoup damages for the unjust enrichment of the Nation

representatives obtained from their failure to collect state sales tax. Again, Sherrill attempts to avoid the bar of sovereign immunity by framing the claim as one for unjust enrichment when in fact it is clearly for the collection of state sales tax.

In *Citizen Band Potawatomi Indian Tribe*, the Supreme Court, in response to the state's argument that although it had a right to collect sales tax it had no remedy, discussed the alternatives a state might have to enforce its right to collect sales tax. *Id.* at 514, 111 S.Ct. at 912. The Court stated: "We have never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)); *see also Dep't of Taxation & Finance of New York v. Milhelm Attea & Bros.*, 512 U.S. 61, 72, 114 S.Ct. 2028, 2035, 129 L.Ed.2d 52 (1994) (restating alternative remedies as set forth in *Citizen Band Potawatomi Indian Tribe*). As can be seen, the Court did not hold, as Sherrill suggests, that whenever a claim against a tribe is barred by sovereign immunity individual tribe members may be sued. Rather, the Court was suggesting that where a tribal official acts outside the law, the official may not be protected by sovereign immunity. *See Ex parte Young*, 209 U.S. at 167, 28 S.Ct. at 457; *see also Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 359 (2d Cir.2000)(explaining that a complaint seeking to impose liability on an individual tribal member must allege that the act was beyond the authority the tribe could lawfully bestow); *Yakama Indian Nation v. Washington Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir.1999)(discussing immunity not available only when state officer acts without any authority).

Sherrill's argument rests upon the Nation's refusal to pay property taxes and to collect state sales tax as being unlawful.

However, the conclusion was previously reached that the property at issue is Indian Country, and therefore the refusal to pay property taxes was in conformity with the law. As was previously noted, Sherrill has not shown any authority upon which to base its claim regarding collection of state sales tax. Thus, it cannot argue that the acts of the Nation or Nation representatives were contrary to law. Accordingly, the Nation representatives enjoy the benefit of the Nation's tribal sovereign immunity. *See Bassett*, 204 F.3d at 358.

■ The Nation representatives' second argument also has merit. New York State law and the Sherrill Charter set forth specific procedures for collection of property taxes. The Sherrill Charter provides only for foreclosure and sale for tax delinquency, but not for personal liability of landowners. (First Carmen Aff. Ex. 19.) Sherrill's authority is limited by its Charter. *See Rose v. Eichhorst*, 42 N.Y.2d 92, 94, 396 N.Y.S.2d 837, 365 N.E.2d 868 (N.Y.1977). Moreover, even if the Sherrill Charter permitted landowner liability, as permitted by New York law, the Amended Complaint would not state a claim against the Nation representatives. New York law (which has not been incorporated into the Sherrill Charter) permits personal liability against an owner of property who is a resident of the city or town in which the property is assessed, if the landowner's name is correctly entered on the roll. N.Y. Real Prop. Tax L. § 926 (McKinney 2000). Sherrill's Amended Complaint does not allege that the Nation representatives are owners of the properties, reside in Sherrill, or have their names on the tax roll. Additionally, it is undisputed that the Nation, not the Nation representatives, is the owner of the property; the Nation representatives reside in Vernon, not Sherrill; and the Nation representatives' names are not on the tax roll for these

properties. It is therefore clear that the Nation representatives cannot be held personally liable for the unpaid property taxes.

### b. *Failure to Join an Indispensable Party*

 The Nation representatives finally contend that the Nation, New York State, and other Sherrill landowners are indispensible parties and therefore the action should be dismissed pursuant to Fed. R.Civ.P. 19(b). Sherrill argues that none are necessary nor indispensable.

A person is necessary and shall be joined as a party if

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). Rule 19 further provides that in the absence of a necessary party the court must determine "whether in equity and good conscience the action should proceed among the parties before it." Fed.R.Civ.P. 19(b). The court should consider "to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provision in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; [and] fourth, whether the plaintiff will have an adequate remedy if the action is dismissed" under this rule. *Id.*

A review of Sherrill's claims and sought after relief makes clear that the Nation is an indispensable party. Sherrill seeks a declaration that the Nation representatives and the Nation are in violation of state law for failure to collect and remit state sales tax. Sherrill further seeks eviction, damages for unjust enrichment based upon the receipt and use of municipal services, injunctive relief prohibiting the Nation from making additional purchases of property within Sherrill, and injunctive relief prohibiting the Nation from expanding or constructing new buildings on the properties. The Nation is the owner of the properties at issue, thus claims a significant interest in the outcome of the action. It is also questionable to what extent relief in the Nation's absence would be adequate, since it is the Nation and not each individual Nation representative that would be directed, for example, to refrain from further purchases. The Nation is an indispensable party under Rule 19(a). *See Fluent v. Salamanca Indian Lease Auth.,* 928 F.2d 542, 547 (2d Cir.1991).

Sherrill contends that reliance on *Fluent* is misplaced and suggests instead reliance on *Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343 (2d Cir.2000). In *Bassett,* the Second Circuit reversed the district court's finding that the tribe was an indispensable party. 204 F.3d at 358. The plaintiff had sued a tribe and museum, among other defendants, for copyright infringment. *Id.* Dismissal of the tribe was required because the tribe was immune from suit. *Id.* In finding that the tribe was not an indispensable party, the *Bassett* Court reasoned that in copyright infringement actions joint tortfeasors are jointly and severally liable, and the victim need not sue each and every joint tortfeasor but may pick and choose which to sue.

*Id.* Thus, a joint tortfeasor in a copyright infringement action is not an indispensable party. *Id.* In those circumstances, therefore, the important factors in the 19(b) analysis were potential prejudice in the absence of the tribe and whether an adequate remedy existed if the action were dismissed. *Id.* Because dismissal would completely deprive the plaintiff of a remedy, and since the tribe as a joint tortfeasor could not be considered indispensable, it was not within the district court's discretion to dismiss the claim. *Id.*

Here, however, the important factors are the prejudice to the Nation, which would be substantial since it is the owner of the properties at issue, and for the same reason the absence of the ability to shape the relief to lessen the prejudice to the Nation. To a lesser extent the adequacy of relief is significant. Moreover, Sherrill does not argue that deprivation of a remedy should be determinative here.

Joinder of the Nation is therefore desirable. However, the Nation enjoys the protection of sovereign immunity against such joinder. *See Fluent,* 928 F.2d at 547.

A balancing of the Rule 19(b) factors is therefore necessary. All of the relief sought would impair and impede the Nation's ability to protect its interests in the properties. Any judgment rendered in its absence would necessarily prejudice the Nation. Relief cannot be shaped in a manner to prevent or lessen that prejudice. While should the action be dismissed pursuant to Rule 19, Sherrill may be deprived of a remedy for the wrongs it alleges, "lack of a forum does not automatically prevent dismissal of the claims asserted," *Id.* Moreover, to permit the suit to continue absent the Nation would undermine federal congressional policy and contravene "the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent." *Id.* at 548.

It is again notable that it is for Congress alone to clearly and unequivocally change the federal policy of affording protection to the Indians and their lands. *See id.* at 547.

In equity and good conscience the action should not be permitted to proceed without the Nation as a party. Rather, the action must be dismissed. *See* Fed.R.Civ.P. 19(b); *Fluent,* 928 F.2d at 548. Given this conclusion, it is unnecessary to determine whether the State and Sherrill landowners would be indispensable parties without which the action should be dismissed.

### 4. *Related Case*

This action, as noted above, was brought by the Nation to prevent Madison County from pursuing an in rem foreclosure proceeding brought against the county properties for tax delinquencies. All the facts in the Lead Case likewise apply in this case. Moreover, as Madison County appeared as amicus curiae in the Lead Case, it had a full opportunity to be heard on the taxation issue. Accordingly, based upon the foregoing determination that the properties at issue are Indian Country and therefore not taxable, the Nation is entitled to judgment on the pleadings. A pending motion by Madison County to dismiss the action for failure to join indispensable parties, pursuant to Fed.R.Civ.P. 19, is resolved by separate Memorandum–Decision and Order filed this day.

### E. *Attorneys Fees*

 A district court is authorized to award attorneys fees to a prevailing party in proceedings to vindicate civil rights. 42 U.S.C. § 1988(b); *Raishevich v. Foster,* 247 F.3d 337, 344 (2d Cir.2001). The first step in determining eligibility for such an award is whether the party seeking attorneys fees is a prevailing party. *Raishevich,* 247 F.3d at 345. Even if prevailing

party status is established, however, the party is not always entitled to attorneys fees. *Id.*

Where special circumstances are present, it may be appropriate to deny attorneys fees. *Id.* at 344. Initially it must be determined "whether 'the plaintiff's claim was so strong on the merits and so likely to result in a substantial judgment that counsel in similar cases could be easily and readily retained.'" *Id.* (quoting *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)). The apparent quality of the case at the time counsel is sought must be considered as an indication of the likelihood that counsel could be retained without the promise of a statutory award of fees. *See id.* Only if this first requirement is met will the final analysis of circumstances be undertaken in order to deny fees. *Id.* at 344–45. Where all of the circumstances, including "the award of punitive damages, the amount of the compensatory award, the degree and measurability of the harm to the plaintiff, and the public interest in the particular claim," indicate that an award of fees "'might work an injustice,'" such an award may be denied. *Id.* (quoting *Kerr*, 692 F.2d at 878).

Here the Nation sought only declaratory and injunctive relief. It did not seek compensatory or punitive damages. The foregoing analysis establishes that the Nation is entitled to the declaratory and injunctive relief sought. Accordingly, the Nation is a prevailing party.

Consideration of the merits of the Nation's claim at the time counsel was sought reveals that the claim was very strong on the merits and was likely to result in a judgment awarding all the relief sought. At that time there was no question that the properties were a part of the original Reservation. There was also no serious question that if the reservation status of

the lands had not been changed by Congress, then the local municipalities lacked authority to tax the properties. Moreover, a search of public records, without the need for discovery, would have led to substantial confidence that no congressional changes in the status of the land had occurred. Additionally, the Nation's due process claim had clear merit in that the process Sherrill followed did not even meet the City Charter requirements. This failure to meet the City Charter requirements would have been clear at the time the Nation attempted to retain counsel.

An initial determination that unique, special circumstances make it appropriate to deny attorneys fees is warranted, although the Nation did not seek compensatory damages. The probability of a significant compensatory award is considered because it does not contravene the purpose of the fee-shifting statute. *Id.* at 344. Rather, the prospect of such an award, in a case with strong merits, makes retention of counsel easier for the civil rights plaintiff, so that an award of attorneys fees does not further the purpose of the fee-shifting statute. *See id.* The purpose of an attorneys fee award is to "'encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel.'" *Id.* (quoting *Kerr*, 692 F.2d at 877). Here, counsel had been obtained for the land claim litigation and this follow-on tax claim litigation. Further, the Nation has significant financial resources. It can be confidently stated that this meritorious civil rights claim would not have "otherwise been abandoned" had there not been the prospect of recovery of a statutory attorneys fee award. *See id.* The strength of the merits of the claims and the significance of the status of the properties at issue, coupled with the known financial

resources of the Nation, make an appropriate case for a finding of special circumstances.

Having determined that the first requirement for denial of fees is met, it must be determined whether an award of fees might work an injustice. Although there is no award of compensatory or punitive damages, the declaratory and injunctive relief obtained works a financial detriment on Sherrill and Madison County. Sherrill and Madison County have lost the property tax revenue from the properties from the time of the reacquisition, for as long as the Nation retains them. The harm to the Nation, given the relief obtained herein, is nonexistent, or at best, relatively little in degree and difficult to measure. The general public does, of course, have an interest in these claims. However, these are not the type of civil rights claims which the law was designed to encourage. Rather, these claims are more in the nature of disputes between sovereign parties.

Special circumstances make this an appropriate case to deny attorneys fees. *See id.* at 344. In light of all of the circumstances of the case such an award is not warranted and would work an injustice. Accordingly, an award of attorneys fees must be denied. *See id.* at 345.

## V. *CONCLUSION*

The Sherrill and Madison County properties that are the subject of the instant lawsuits are Oneida Reservation lands and therefore are Indian Country pursuant to 25 U.S.C. § 1151. The 1838 Treaty of Buffalo Creek did not disestablish or diminish the Oneida Reservation. As Indian Country, the properties are not subject to taxation by Sherrill or the Counties. Moreover, Sherrill did not provide the Nation the process it was due in foreclosing on the properties. Sherrill's motion for summary judgment in the Lead Case must

therefore be denied. Sherrill's motion to amend its answer must also be denied, as amendment to add the asserted affirmative defenses would be futile. The Nation's cross motion for summary judgment in the Lead Case on its taxation and its due process claims must be granted. Sherrill's counterclaims against the Nation in the Lead Case are barred by sovereign immunity. The Nation is entitled to judgment in its favor on the counterclaims.

The Nation is also protected by sovereign immunity from suit for eviction by Sherrill and therefore is entitled to judgment in its favor in the Eviction Case.

The motion to stay in the Member Case is moot. The actions of any individual Nation representatives in directing the Nation not to pay property taxes was not *ultra vires*, as the properties are Indian Country and not taxable. The lawsuit against the Nation representatives for collection of property taxes is contrary to the Sherrill Charter and New York State law. Moreover, the Nation would be an indispensable party and any such suit must be dismissed in its absence. The motion to dismiss brought by the Nation representatives in the Member Case must be granted.

The properties in question being Indian Country, the Nation is entitled to judgment on the pleadings in the Related Case against Madison County.

The Nation is not entitled to an award of attorneys fees.

Accordingly, it is

ORDERED that

1. The City of Sherrill's motion for summary judgment or in the alternative for a preliminary injunction in the Lead Case 00–CV–223 is DENIED;

2. The Oneida Indian Nation of New York's cross motion for summary judg-

ment in the Lead Case 00–CV–223, on all claims and counterclaims, is GRANTED;

3. The counterclaims against the Oneida Indian Nation of New York brought by the City of Sherrill in the Lead Case 00–CV–223 are DISMISSED;

4. The City of Sherrill's motion to amend its answer to add affirmative defenses in the Lead Case 00–CV–223 is DENIED;

5. The Oneida Indian Nation of New York's motion for summary judgment in the Eviction Case 00–CV–327 is GRANTED, and the petition for eviction is DISMISSED;

6. Ray Halbritter, Keller George, Chuck Fougnier, Brian Patterson, Marilyn John, Clint Hill, Dale Rood, Dick Lynch, Ken Phillips, Iva Rodgers, Beulah Green, and Ruth Burr's motion to dismiss in the Member Case 00–CV–1106 is GRANTED, and the complaint is DISMISSED;

7. Judgment on the pleadings in favor of the Oneida Indian Nation of New York and against Madison County is GRANTED in the Related Case 00–CV–506;

8. The properties at issue, known by tax identification as City of Sherrill parcels 322.014–1–23, 322.014–1–24, 322.014–1–25, 322.014–1–26, 322.015–2–1, 322.015–2–64, 322.015–2–65, 322.015–2–40.3, 322.015–2–45.1, 322.015–2–47 and Madison County parcels 28.–2–13.11, 28.–2–13.2, 36.5–1–20, 36.38–1–34, 36.6–1–4, 36.38–1–33, 36.38–1–32, 36.62–2–21, 91.–1–51, 36.6–1–1, 36.6–1–3, 36.–1–2, and 28.–2–13.12 are Indian reservation land immune from state and local property taxation while in the possession of the Oneida Indian Nation of New York; the Oneida Indian Nation of New York is immune from property taxation with respect to these properties, attempts by the City of Sherrill and Madison County to tax or foreclose on these properties while they are in the possession of the Oneida Indian

Nation of New York are null and void; tax sales with respect to these properties are null and void; attempts by the City of Sherrill to foreclose and to convey them violated 42 U.S.C. § 1983 because of constitutionally-deficient notice; attempts by the City of Sherrill and Madison County to interfere with the ownership, possession, and occupancy of the Oneida Indian Nation of New York with respect to these properties or to evict the Oneida Indian Nation of New York from said properties are null and void;

9. The City of Sherrill and its officers, agents, servants, and employees and all persons and entities in active concert or participation with them are hereby ENJOINED and RESTRAINED from taking any act to impose property taxes upon, or to collect property taxes with respect to the properties known by tax identification numbers 322.014–1–23, 322.014–1–24, 322.014–1–25, 322.014–1–26, 322.015–2–1, 322.015–2–64, 322.015–2–65, 322.015–2–40.3, 322.015–2–45.1, 322.015–2–47 while they are in the possession of the Oneida Indian Nation of New York; from interfering with the Oneida Indian Nation of New York's ownership, possession, or occupancy of these properties; and from taking any act to evict the Oneida Indian Nation of New York or its officers, agents, servants, employees, members, guests, customers or invitees from these properties; and are further ENJOINED to rescind and reverse all property transfers with respect to foreclosure or conveyance regarding these properties and to record these properties as owned by the Oneida Indian Nation of New York until such time as a conveyance of them is approved pursuant to 25 U.S.C. § 177; and

10. Madison County and its officers, agents, servants, and employees and all persons and entities in active concert or participation with them are hereby EN-

JOINED and RESTRAINED from taking any act to impose property taxes upon, or to collect property taxes with respect to the properties known by tax identification numbers 28.–2–13.11, 28.–2–13.2, 36.5–1–20, 36.38–1–34, 36.6–1–4, 36.38–1–33, 36.38–1–32, 36.62–2–21, 91.–1–51, 36.6–1–1, 36.6–1–3, 36.–1–2, and 28.–2–13.12 while they are in the possession of the Oneida Indian Nation of New York; from interfering with the Oneida Indian Nation of New York's ownership, possession, or occupancy of these properties; and from taking any act to evict the Oneida Indian Nation of New York or its officers, agents, servants, employees, members, guests, customers or invitees from these properties; and are further ENJOINED to rescind and reverse all property transfers with respect to foreclosure or conveyance regarding these properties and to record these properties as owned by the Oneida Indian Nation of New York until such time as a conveyance of them is approved pursuant to 25 U.S.C. § 177.

11. Attorneys fees pursuant to 42 U.S.C. § 1988 are DENIED.

The Clerk of the Court is directed to enter separate judgments in each case in accordance with this Memorandum–Decision and Order.

IT IS SO ORDERED.